**In re G.W. BURKLOW and Ute Burklow, Debtors.**

**Joseph LaFATA dba California Tailors Traditional Clothing, Plaintiff,**

**v.**

**Gary BURKLOW, aka Gary William Burklow, aka G.W. Burklow, Defendant.**

**Bankruptcy No. 83–05295–P7.**
**Adv. No. C84–0114–P7.**

United States Bankruptcy Court, S.D. California.

May 13, 1986.

Margaret M. Mann, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for plaintiff (creditor).

Herbert N. Niermann, Orange, Cal., for debtors.

## MEMORANDUM DECISION

JOHN J. HARGROVE, Bankruptcy Judge.

### I.

### INTRODUCTION

On November 14, 1983, Gary Burklow ("Burklow") and his wife, Ute Burklow, filed their Petition for Relief under Chapter 7 of Title 11, United States Code.

On February 7, 1984, Joseph LaFata, dba California Tailors Traditional Clothing ("LaFata") filed a Complaint to seek a determination that Burklow's debt to him was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

The matter came on for trial on January 22, 1986 and again on March 13, 1986. This court took the matter under submission to prepare this Memorandum Opinion.

### II.

### FACTS

During the period November 6, 1980 through April 11, 1982, Burklow purchased various items of clothing, including shoes, suits, dress shirts, and other accessories from LaFata. Approximately $34,000 worth of the clothing over this year and a half period was purchased on credit. Interest has accrued on this figure so that the debt at the time of the filing of the Chapter 7 Petition amounted to approximately $45,000. This debt was scheduled in the amount of $45,000 and was not scheduled as either contingent, disputed or unliquidated.

LaFata testified that he came to the United States from Italy in 1965, when he was approximately 48 years old. After arriving in the United States he worked mostly as a tailor. In approximately 1978, he opened a retail clothing store known as California Tailors Traditional Clothing. In late 1980 Burklow came into the store and ordered a special order of shoes. When the shoes came in he was delighted and, according to LaFata, began coming in almost every other day to order clothes. Because of Burklow's unusual size, most of his clothing had to be special ordered.

LaFata then testified that Burklow requested that he open an account for him. Although LaFata testified that most of his customers paid cash he indicated his store was fairly new and he accommodated Burklow by opening up a "house account". LaFata testified that Burklow told him it would not be necessary to mail statements to him because he didn't want his wife to know that he was purchasing the clothing on credit. Accordingly, Burklow did not provide LaFata with a home address. LaFata testified that Burklow told him that he would simply come in and pay the account balance.

A review of LaFata's account ledger does in fact show that on November 6, 1980 Burklow gave LaFata a down payment of $250.00 to open the account thereby leaving the account with a credit balance. Thereafter, the account reflects numerous charges by Burklow for clothing and other miscellaneous items and numerous payments by Burklow. Unfortunately, for LaFata, the frequency and amount of the periodic payments did not keep pace with the goods purchased on credit by Burklow. By the end of January, 1981, Burklow's account had an approximate balance of $3,046.28. Burklow managed to whittle that balance down to $775.47. By June 22, 1981, however, the account balance had grown again to $3,073.76. After June 22, 1981, Burklow apparently charged $2,465.03 worth of clothing and the account

grew to $6,723.05 by July 30, 1981. By October 1, 1981, the account balance was $11,713.97 and, by October 31, 1981, the account balance was $22,438.38. By December 29, 1981, the account balance had reached the sum of $29,177.56. On April 11, 1982, the date that the account reflects that Burklow made his last charge, the account balance had reached the sum of $32,202.04. By this time, LaFata had commenced charging interest on the account. All during this period, Burklow continued to bring in payments, ranging from a low of $20.00 in May of 1981 to a high single payment of $650.00 given on June 11, 1981.

LaFata testified that he extended credit to Burklow because he "trusted" him and that Burklow was his "friend". That Burklow gave LaFata the impression that he was his friend is indeed substantiated by a letter to LaFata from Burklow dated March 16, 1982, which states in pertinent part:

"Joe, since the time of meeting you, there was an immediate unique friendship, and I have since then really learned to appreciate you as a person. You have been a true friend to me, and for that I want to thank you. I care much about you, and your family. We meet many people in our walks of life, but with few do we share a friendship, as I feel with you. I want to thank you for all the kindness you've shown to me. Really Joe, thanks from the bottom of my heart...."

When questioned further as to why he kept extending Burklow credit as the account balance grew, LaFata testified that Burklow also told him that he was a doctor. Additionally, Burklow also told LaFata that he had an investment in a trucking firm and that he owned his own home in La Jolla, California.[1] LaFata testified that Burklow's representation that he was a doctor had a great impression on him because in Italy, where he came from, a doctor was a person who you would "look up

to" and that you would "take him at his word".

LaFata explained that the reason the account "skyrocketed" in the Fall of 1981[2] was because that in April and May of 1981 Burklow had charged a substantial order including six or seven special suits. When the store received the suits in approximately October, 1981, they were then charged to the account. LaFata and his store manager also testified that they did not give these suits to Burklow because his account was so high at the time. They further testified that, with the exception of about $2,000 worth of goods, they were unable to resell any of the specially ordered items because of their odd sizes.

LaFata also testified that when he pressed for further payment in the Fall of 1981, Burklow told him not to worry about it, that he was selling his house and he would have sufficient cash from the sale proceeds to pay the account off.

Burklow, who was called as a witness by LaFata, testified that he was not a doctor and did not have any ownership interest in a trucking company. He testified that he was ordained as a minister of the "Assembly of God" in Illinois and that he was licensed in Texas. It was stipulated by the parties that the sole source of income for either Burklow or his wife, from November, 1980 through August, 1982, was the sum of approximately $600 per month paid to Burklow by the Beth-El Christian Center where Burklow was employed as a minister. It was also stipulated that during the period November, 1980 to August, 1982, Burklow owned no real property of any kind and that all he owned was an automobile and articles of clothing, furniture and other personal effects. It was also stipulated that Burklow was aware at all times that all of the clothing that he obtained from LaFata were not intended to be gifts from LaFata.

1. La Jolla is a wealthy community within the City of San Diego, California.

2. On October 1, 1981, the account balance was $11,230.51. By November 7, 1981, the account balance was $24,220.75.

Several witnesses called by LaFata testified that they were members of Burklow's congregation in 1980 and 1981 and that Burklow told them that he had a tailor who was providing his suits for free. One witness said that Burklow told his congregation that he got his suits for free on several occasions. The witness said that Burklow told him it was "like advertising". One of the witnesses in unrebutted testimony testified that Burklow told her that his suits were given to him by his tailor, "because he doesn't know I'm a pastor—I'm advertising them for him".

Also admitted at trial were the Judgment Debtor Examination of Burklow dated November 30, 1983, the Deposition Transcript of Burklow dated April 18, 1984 and the Deposition Transcript of Burklow dated August 10, 1984.

At the Rule 2004 Examination and the deposition, Burklow testified that a wealthy individual, whose name he did not know, offered to buy him some clothes. Burklow testified that the gentleman visited his church a couple of times and told Burklow that he was a very talented person and that he was poorly dressed. Burklow testified that the gentleman indicated that he wanted to buy Burklow some clothes and that he did in fact give him money on several occasions. Burklow testified that Burklow's deposition and Rule 2004 Examination reveals that he had no idea the total of amount of money he had received from the unnamed individual.

## III.

### DISCUSSION

Section 523(a)(2)(A) provides in pertinent part:

"(a) A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt—...

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—...

(A) false pretenses, a false representation, or actual fraud...."

The Ninth Circuit Court of Appeals in *In re Houtman*, 568 F.2d 651, 655 (9th Cir. 1978) delineated a five part test for determining when a debt is nondischargeable:

(1) the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations; and

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made.

Further, the Ninth Circuit Bankruptcy Appellate Panel in *In re Kurdoghlian*, 30 B.R. 500, 502 (Bankr. 9th Cir.1983) has held that a debtor makes an "implicit representation" that credit he incurs will be repaid to the creditor. Further, in a nondischargeability action involving a check guarantee card, the court in *In re Singleton*, 37 B.R. 787 (Bankr.Nev.1984) recognized:

Courts have repeatedly held that "whenever a credit card holder uses his credit card, he is representing that he has both the ability and the intention to pay for the purchases and the credit card issuer relies on those implied representations in extending credit to the card holder" *Id.* at 791

█ Therefore, each time Burklow charged an item to his account he impliedly represented that he had both the intention and the ability to pay for those purchases.

█ By stipulation, Burklow admitted that his income at the relevant time period averaged only approximately $600 per month. Further, he owned no other assets which he could liquidate to pay for the $34,000 worth of clothing. Additionally, clear and convincing evidence was presented that Burklow had the intent and the purpose of deceiving LaFata. He told LaFata that he was a doctor, he told LaFata that he owned a trucking interest and that he had a home in La Jolla, California. By the time the account was in the $20,000 area, he again assured LaFata that it

would be taken care of because his home was in escrow and that he would have sufficient proceeds to pay the account in full. At no time during the relationship did he ever tell LaFata that he was a minister earning $600 per month. Further, he refused to fill out a credit application. Additionally, the testimony adduced at trial revealed that Burklow told his parishioners that he had received the clothes free of charge from his tailor. Obviously, Burklow had no intention of paying LaFata for all of his "purchases".

Burklow argues that it "stretches credibility" to believe that LaFata could have possibly relied on the continued representations by Burklow that he was going to pay the account in full. Burklow argues that LaFata's reliance could not possibly be reasonable since he continued to extend Burklow credit even after the account balance nearly doubled in October 1981.

Further, Burklow argues that each transaction during the entire course of the account stated is a separate transaction requiring an independent test and that once again it would be highly unreasonable for LaFata to extend a credit to Burklow particularly when the account got into the $6,000 or $7,000 range. Indeed, Burklow points to the fact that LaFata's store manager brought the question of Burklow's ability to pay to LaFata in June or July of 1981.

LaFata argues that the reliance element of the *Houtman* test is analyzed according to a subjective rather than an objective standard. Citing *In re Sobel*, 37 B.R. 780, 785 (Bankr.E.D.N.Y.1984), LaFata argues that during this time period, LaFata was a self-made man who had immigrated from Italy and was relatively inexperienced as far as running a business was concerned.

LaFata testified that he would not have extended credit to Burklow if he thought Burklow would not pay for the items charged. Burklow represented and LaFata believed that Burklow was a doctor and a man of some financial means with an interest in a trucking company. When LaFata and Burklow would meet to discuss the growing outstanding balance, Burklow always had an answer or managed to sidestep the question or he would make a payment on the account. Finally, in the Fall of 1981 when the account was in the $20,000 range Burklow told LaFata he had his La Jolla home in escrow and that the proceeds would be sufficient to pay the account in full. LaFata trusted Burklow as a close friend and, in his mind, Burklow's word was good enough for him.

This court adopts the subjective standard enunciated in *In re Sobel, supra,* and finds that LaFata's reliance on the debtor's representations was reasonable because of the relationship of trust and confidence that had been established between the parties. LaFata extended credit only to his friends and the evidence is clear that during the relationship LaFata considered Burklow as his friend.

In view of these facts, LaFata has demonstrated reasonable reliance on the fraudulent representations of Burklow to pay for all of the items which he purchased on credit.

■ Further, Burklow's contention that each and every credit transaction must be separately analyzed is misplaced. The continuing credit relationship established by Burklow's repeated credit purchases established what is known as an account stated under California common law. *California B.G. Assn. v. Williams,* 82 Cal.App. 434, 442, 255 P. 751 (1927).

IV.

CONCLUSION

This matter is a core proceeding arising under Title 11 of the United States Code pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(I).

Burklow is to receive a credit of $2,000 for those certain articles of clothing that LaFata was able to resell.

This court holds that for the reasons stated herein, the indebtedness of defendant Gary Burklow to plaintiff Joseph LaFata, after deduction of the $2,000 credit, is

determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

Counsel for the plaintiff shall prepare an Order in accordance with this Memorandum Decision no later than 10 days of entry hereof.