**In re Ronald KIRSH; In re Paula Kirsh, Debtors.**

**EUGENE PARKS LAW CORPORATION DEFINED BENEFIT PENSION PLAN, Plaintiff–Appellant,**

v.

**Ronald KIRSH; Paula Kirsh, Defendants–Appellees.**

No. 91–55701.

United States Court of Appeals, Ninth Circuit.

Submitted * July 6, 1992.

Decided Aug. 31, 1992.

---

* The panel finds this case appropriate for submission without oral argument pursuant to 9th Cir.R. 34–4 and Fed.R.App.P. 34(a).

Gary Brown, Century City, Cal., for plaintiff-appellant.

James M. Leonard, Leonard & Zeitsoff, Los Angeles, Cal., for defendants-appellees.

Before FARRIS, WIGGINS and FERNANDEZ, Circuit Judges.

PER CURIAM:

Ronald and Paula Kirsh (the Kirshes) filed for bankruptcy, and the Eugene Parks Deferred Benefit Pension Plan (the Plan) asked that the Kirshes' debt to it be found nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). The bankruptcy court denied that request because it found that the Plan had not relied on the Kirshes' false representations. The district court affirmed the bankruptcy court. We affirm.

### BACKGROUND

Eugene Parks (Parks) is an attorney who established the Plan to provide for his retirement. Parks had been practicing law for twenty years and the area of his practice was business law. That included handling real estate transactions in which he represented buyers, sellers or brokers. The Plan was intended to be the basis of Parks' retirement security, so in his capacity as its administrator he was cautious

about lending the Plan's money. He did not use it for speculative purposes.

Ronald Kirsh (Kirsh) had been a client of Parks for ten years and their relationship was not simply that of attorney and client. They socialized together and, as Kirsh said, Parks "was everything to me. He was all my advice, he was all my legal advice, all my personal advice, all my marital advice." In a 1987 letter, Kirsh wrote, "I think of you like my own father.... Thank you, your son Ronnie." Clearly, these men were very close personal friends.

In 1987, the Kirshes had fallen on hard times and were deeply in debt. Parks knew that the Kirshes did not always pay their legal bills on time, but he still agreed to lend them money from the Plan. In doing that, he insisted upon receiving security in the form of a deed of trust on real property owned by the Kirshes. He also obtained a little additional security by having the Kirshes give him postdated checks for the first four interest payments. This dispute revolves around that loan transaction.

The loan was in the amount of $40,000 and the Kirshes gave the Plan a deed of trust on a condominium they owned. The note which that deed of trust secured contained the following recitals:

A. Warrantee [sic]: For the purpose of inducing the Payee/Lender to make this loan, we represent that:

(a) The present value of the property securing this loan is $240,000.00; and

(b) The only encumbrance senior to this loan is a First Deed of Trust in favor of Glendale Federal S & L Association with an outstanding loan balance of approximately $140,000.00.

The terms of the loan to the Kirshes were fair, reasonable, and fully disclosed to them. There was not a breath of actual overreaching on the part of Parks. Neither the Plan nor Parks ordered a title report of any kind. They simply accepted the Kirshes' representations about the state of the security.

Those representations were false. In fact, the property was encumbered by two deeds of trust. One secured a loan from Glendale Federal Savings and Loan with an unpaid balance of $133,200. That loan was in default. The other, which was taken out just one month before the transaction with the Plan, secured a loan with a balance of $120,000 from Mercantile National Bank. The Plan's note was therefore secured by a third deed of trust. When the condominium was ultimately foreclosed upon, the Plan received nothing. The proceeds of the sale were just enough to pay off Glendale Federal and to leave about $17,200 for Mercantile National.

The Plan received very little return on its investment before the Kirshes filed bankruptcy. It claimed that it had been defrauded and sought to exempt the debt from discharge, but the bankruptcy court found in favor of the Kirshes. The district court affirmed, and the Plan appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

■ We review the bankruptcy court's findings of fact under the clearly erroneous standard, and its conclusions of law de novo. *In re Jogert, Inc.*, 950 F.2d 1498, 1505 (9th Cir.1991). The determination of justifiable reliance is a question of fact subject to the clearly erroneous standard of review. See *id.*, where the phrase "reasonable reliance" was used, about which we will say more in this opinion. The issue of nondischargeability is a question of federal law and is governed by the provisions of the Bankruptcy Code. *Grogan v. Garner*, —— U.S. ——, ——, 111 S.Ct. 654, 658, 112 L.Ed.2d 755 (1991).

## DISCUSSION

As we have already pointed out, when the Kirshes sought the protection of the bankruptcy court, the Plan sought to prevent the discharge of their debt. It relied upon the fraud provision of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2) provides in pertinent part that a debtor is not entitled to be discharged from

any debt to the extent that the debt was obtained by:

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

■ As a plain reading of the statute shows, parts (A) and (B) are mutually exclusive, the former referring to representations other than those respecting the debtor's financial condition and the latter referring specifically to written statements of financial condition. This difference has been recognized by other courts. *See In re Ophaug*, 827 F.2d 340, 342–43 (8th Cir. 1987); *In re Seaborne*, 106 B.R. 711, 714 (Bankr.M.D.Fla.1989). *Cf. In re Siriani*, 967 F.2d 302, 304 (9th Cir.1992) ("the two subsections of section 523 are substantially similar"). For present purposes it is enough to point out that the statement we are considering did not purport to set forth the debtors' net worth or overall financial condition, so our analysis must revolve around 11 U.S.C. § 523(a)(2)(A).

■ We have outlined the elements which a creditor must prove in order to preclude a debtor's discharge. Those are:

(1) [that] the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Britton*, 950 F.2d 602, 604 (9th Cir. 1991) (quoting *In re Houtman*, 568 F.2d 651, 655 (9th Cir.1978) (emphasis omitted)).

In this case, there can be no doubt that the Kirshes made representations which they knew were false and that they made those representations with the intention of deceiving Parks and the Plan. Nor can it be doubted that those representations were the proximate cause of the Plan's losses. Thus, elements (1), (2), (3) and (5) are satisfied. Our analysis will therefore focus upon the fourth element. The Kirshes contend that the Plan did not prove that element by a preponderance of the evidence. That is the Plan's burden. *See Grogan*, — U.S. at —, 111 S.Ct. at 658. The Kirshes also contend that since Parks was their attorney, the Plan should not be able to prevent their discharge. We will consider each of these issues in turn.

## A. Reliance.

### (1) *The Legal Standard.*

The courts have had some difficulty with the reliance issue and that has, at least on the surface, generated a split among the circuits. That split is over what word should implicitly or explicitly precede the word "reliance." Should we say "actual reliance" or "reasonable reliance" or "justifiable reliance"? We now decide that the latter phrase is the proper one and that it most accurately describes what the courts have actually done.

We start with the Supreme Court's observation that we are deciding a question of federal, not state, law. *Grogan*, — U.S. at —, 111 S.Ct. at 658–59. That, of course, does not reveal the content of the federal law itself, but there is reason to think that it is simply the common law. The Supreme Court has pointed us in that direction. While the Court has recognized the fresh start purpose of the bankruptcy law, it has also emphasized that the real concern is for the "honest but unfortunate debtor." *Id.* at —, 111 S.Ct. at 659. The Court completed that thought by stating: "We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions,

would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Id.* This suggests to us that the Court had the usual common law standard in mind, rather than some exotic standard designed to give more protection to the perpetrators of fraud. Nor is there any reason to believe that Congress itself intended to alter the common law when it adopted section 523(a)(2)(A). Rather, as the court suggested in *In re Howarter,* 114 B.R. 682, 685–86 (B.A.P. 9th Cir.1990), it is most likely that Congress was referring to the common law definition of fraud when it adopted that section. Perhaps Congress intended to deviate from that definition when it went out of its way to set forth a specific standard for section 523(a)(2)(B), one that referred to reasonable reliance, but we need not decide that question here. *Compare Siriani,* 967 F.2d at 304 (the provisions are similar) *with Ophaug,* 827 F.2d at 342–43 (the provisions set forth different standards).

If common law is to apply, it is important to identify the content of that law. We turn to two of the best sources of that law, the well-known *Prosser and Keeton on the Law of Torts* and the *Restatement (Second) of Torts.* They make it quite clear that at common law the justifiable reliance standard is the proper one.

*Prosser and Keeton* declares that reliance must be justifiable, which, as it says, seems to be for the purpose of "providing some objective corroboration to plaintiff's claim that he did rely." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts,* § 108 at 749–50 (5th ed. 1984). As that work points out, the standard is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves. Thus, "a person of normal intelligence, experience and education ... may not put faith in representations which any such normal person would recognize at once as preposterous...." *Id.* at 750. At the same time, the standard does protect the ignorant, the gullible, and the dimwitted, for " 'no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " *Id.* at 751 (footnote and citation omitted). On the other hand, if a person does have "special knowledge, experience and competence" he may not be permitted to rely on representations that an ordinary person would properly accept. *Id.* In other words, while reasonableness of behavior is a factor in the mix, it is only a factor. The more precise question is whether the person who claims to have been gulled was justified in relying. The difference in approach can make a significant difference in the result of the analysis.

The *Restatement* is to the same effect. It declares that one can recover for a fraudulent representation if "his reliance is justifiable." *Restatement (Second) of Torts* § 537(b) (1977). It goes on to state that where there is justifiable reliance on a fraudulent misrepresentation, a person's recovery will not be barred by his contributory negligence. *Id.* § 545A. However, a person cannot rely upon a representation if "he knows that it is false or its falsity is obvious to him." *Id.* § 541. This rule is illustrated by the following example:

> [I]f one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.

*Id.* at § 541 cmt a.

On the other hand, one who receives a fraudulent misrepresentation of a fact "is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Id.* § 540. That even applies to people who do not examine the public records in real estate transactions, for "[t]he recording acts are not intended as a

protection for fraudulent liars." *Id.* § 540 cmt b.

While, as we have said, we are applying federal, not state, law, it is worth noting that California, where the Kirshes' acts took place, follows the rules we have just explicated. Its law was defined over fifty years ago when Justice Traynor wrote *Seeger v. Odell*, 18 Cal.2d 409, 115 P.2d 977 (1941). There, through various machinations some bounders managed to deprive an elderly couple of their property. The falsity of the representations would have been apparent to any person who looked at the public records. Moreover, the couple actually lived on the land which, the con artists said, had been sold at a sheriff's sale. The court synopsized the law as follows: A plaintiff must show that "he was justified in his reliance," but negligence in failing to discover an intentional misrepresentation is no defense. 18 Cal.2d at 414, 115 P.2d 977. Moreover, "[t]he fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery, and it is well established that he is not held to constructive notice of a public record which would reveal the true facts." *Id.* at 414–15, 115 P.2d 977 (citations omitted). "Nor is the plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical reasonable man." *Id.* at 415, 115 P.2d 977. It is only if "the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable" that he will be denied recovery—a person cannot purport to rely on preposterous representations or close his eyes "to avoid discovery of the truth...." *Id.* Thus, the court said, neither public records nor the argument that a person should know the state of his own title could preclude recovery. *Id.* at 415–16, 115 P.2d 977.

We have recognized this reading of the California law. In *Jogert* we referred to the standard as being that of "reasonable reliance" but we went on to describe that standard as California does. In other words, we described it in the language of justifiable reliance. 950 F.2d at 1505–07. This use of the word "reasonable" in place of "justifiable" is of no real moment unless

a later reader is led away from the true content of the reliance element.

Having outlined the common law, it remains to us to consider the cases which have spoken to the reliance issue in the bankruptcy context.

This circuit has not explicitly stated what the standard should be. We have just described *Jogert* which arose in the context of a bankruptcy case, but it applied California law and did not purport to consider the meaning of section 523(a)(2)(A). We have also mentioned *Britton*, 950 F.2d at 604, where the unadorned word "reliance" was used. Our decisions in *In re Houtman*, 568 F.2d 651, 655 (9th Cir.1978) and *In re Taylor*, 514 F.2d 1370, 1373 (9th Cir.1975), are to the same effect as *Britton*.

We had occasion to mention the standard again in *In re Rubin*, 875 F.2d 755 (9th Cir.1989). However, while we said that the creditor's reliance *was* reasonable, we expressly declined to decide whether reasonable reliance was required. *Id.* at 759 n. 2. In doing so, we set out a group of facts that described a case of justifiable reliance. *Id.* at 759. *See also In re Ashley*, 903 F.2d 599, 604 n. 6 (9th Cir.1990). Most recently, in *Siriani*, we suggested that "reasonable reliance" was required; however, that statement was not only dictum but also suggested that *Rubin* so held, which it did not. *Siriani*, 967 F.2d at 304.

Other circuits have been somewhat more explicit. The Eighth Circuit, in particular, has said that only actual reliance is required. In *Ophaug* that court considered a case where a person loaned money to a friend of his, a man he had known and socialized with for over ten years. 827 F.2d at 341. Ophaug had represented that the money was to be used to purchase some other land, and had given a security interest in machinery for the purpose of securing his note. The money was not intended for a land purchase and the machinery was already encumbered. The bankruptcy court held against the creditor because, as it said, his reliance was not reasonable. *Id.* at 342. The Eighth Circuit declared that it need not be reasonable but

need only be actual, which it was. *Id.* at 343. A similar set of facts is found in *In re Phillips*, 804 F.2d 930 (6th Cir.1986). There the lender was a banker and an attorney. He loaned money to a friend whom he had known for twenty-five years, and took back a mortgage to secure the debt. He did not seek a title report, "due to his long personal relationship with the Phillips.". *Id.* at 931. The bankruptcy court and the district court both found that the creditor's reliance was unreasonable. The Sixth Circuit reversed. It held that considering the long friendship and the fact that the creditor had no reason to distrust Phillips, the bankruptcy and district courts had held the creditor "to an overly stringent legal standard of 'reasonableness.'" *Id.* at 933. What is most interesting about this pair of cases is that both seem to be applying a standard of justifiable reliance, even though one court—the Eighth Circuit—said actual reliance was enough and the other court—the Sixth Circuit—applied a standard of reasonable reliance. In both cases, it is fair to say that the lender simply relied upon the honesty of an old friend, who took advantage of him. That is a typical case of justifiable reliance. It is rather doubtful that the Eighth Circuit would find actual reliance in other circumstances, for example, if a person's claimed reliance was manifestly unreasonable, preposterous, or the result of an intentional closing of his own eyes to the facts. The same can be said of the Sixth Circuit's application of the concept of reasonable reliance.

The other cases in this area are to much the same effect. We will not unduly extend this opinion by canvassing their facts in depth, but will make a brief mention of some of them. *See In re Allison*, 960 F.2d 481, 485 (5th Cir.1992) (applies "actual reliance" but describes facts that would justify reliance); *In re Mullet*, 817 F.2d 677, 679 (10th Cir.1987) (applies "reasonable reliance" and found it did not exist where a bank rather blindly accepted the word of an unknown, unproven, twenty-three year old customer); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985) (applies "reasonable reliance" and finds bank's reliance on the word of a regular customer to be reasonable, even though the bank knew that he was short of capital); *In re White*, 130 B.R. 979, 987 (Bankr.D.Mont.1991) (applies "reasonable reliance" but described the creditor's acts as such "unreasonably reckless wishful thinking as to constitute no reliance at all"); *Seaborne*, 106 B.R. at 714 (applies "actual reliance" but the creditor's acts appear to have been justified); *In re Burklow*, 60 B.R. 728, 732 (Bankr.S.D.Cal. 1986) (applies "reasonable reliance" and finds the creditors reliance reasonable because the test is subjective and the creditor relied upon a friend).

Finally, we return to *Howarter*, the decision of the Ninth Circuit Bankruptcy Appellate Panel. In that case, again, the court declared that it was adopting the common law and stated that reasonable reliance was required. 114 B.R. at 685–86. The facts, however, are instructive. The debtor had an investment business and the creditor had invested through him in the past. When asked about a particular investment, the debtor told the creditor not to make it. When asked again, the creditor was told not to borrow on his own residence for the purpose of making the investment. The creditor then independently learned that there were serious problems with the investment. He still persisted and the debtor finally accepted some money from him. *Id.* at 683–84. Given that set of facts, the court found no reasonable reliance. This does, however, look like the classic case of a lack of justifiable reliance—the kind of situation where the creditor " 'must have closed his eyes to avoid discovery of the truth....' " *Seeger*, 18 Cal.2d at 415, 115 P.2d 977 (citation omitted).

 Thus, we conclude that a creditor must prove justifiable reliance upon the representations of the debtor. In determining that issue, the court must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor.

(2) *Application of Legal Standard.*

When the bankruptcy court decided this case it spoke in terms of reasonableness but its findings indicate that Parks did not justifiably rely upon the Kirshes' representations regarding the state of their title.

Parks was no ordinary person. In fact, he was not even an ordinary attorney. He had been practicing for twenty years and concentrated on business law. He was well aware of the fact that standard practice in California was for lenders to obtain title reports. Lenders do not merely rely upon the representations of borrowers. That is especially true when the lender knows that the borrower is having financial difficulties and does not always pay his bills in a timely fashion. We recognize that Parks and Kirsh were very close friends, but that does not excuse Parks' throwing of all caution to the winds and relying on the Kirshes' word alone. Obtaining a title report is a simple and not overly expensive proposition. A person with Parks' knowledge, experience and competence should have ordered one. Thus, this case differs from *Ophaug* where the creditor was not an expert and did not know that the debtor was in any financial difficulty. 827 F.2d at 341. Nor is it like *Phillips* where the creditor was not a practicing attorney. 804 F.2d at 931.

In short, given the facts of this case the bankruptcy court did not err when it found that Parks did not rely upon the Kirshes' representations within the meaning of section 523(a)(2)(A).

B. The Attorney–Client Relationship.

The Kirshes argue that Parks entered into this transaction with a client and did not fully comply with the California Rules of Professional Conduct. Thus, they assert, the Plan should be precluded from obtaining relief in this proceeding.

At the time of this transaction the Rules of Professional Conduct required an attorney to refrain from entering into business transactions with his client unless: (1) the transaction and terms were fair and reasonable to the client fully disclosed in writing, and in language the client should rea-sonably have understood; (2) the client consented to the transaction in writing; and (3) the client was given a reasonable opportunity to seek the advice of independent counsel. *See* Cal.R.Prof. Conduct, 5–101 (repealed). The bankruptcy court determined that Parks had complied with the first two of these requirements. However, it also found that Kirsh did not have an opportunity to consult with another attorney.

Taking those findings as accurate, we agree with the bankruptcy court that they do not preclude the Plan's petition. The Rules of Professional Conduct do not establish substantive legal duties—they neither create, augment nor diminish any duties. Cal.R.Prof. Conduct 1–100. While the rules can be evidence of a breach of fiduciary duty, they do not, standing alone, prove the breach. *See, Mirabito v. Liccardo,* 4 Cal.App. 4th 41, 44–46, 5 Cal. Rptr.2d 571 (1992). No such breach appeared in this case.

This is not a case where a faithless attorney has taken advantage of his client. Quite the reverse. In this case, the Kirshes took advantage of a personal relationship and relieved the Plan of $40,000. The Rules of Professional Conduct were designed for particular purposes. They were not intended as a protection for clients who wrong their lawyers.

## CONCLUSION

We hold that the bankruptcy court correctly determined that the Kirshes could discharge their debt to the Plan. On the facts of this case, the Plan did not justifiably rely upon the Kirshes' representations about the state of their title.

AFFIRMED.

FARRIS, Circuit Judge, concurring.

I agree with the bankruptcy court that Ronald Kirsh failed to reasonably rely upon the debtor's representations. *See Ronald Kirsh v. Eugene Parks Law Corporation Defined Benefit Pension Plan (In re Kirsh),* Case No. 89–04738, Adv. No.

89–1080 (C.D.Cal. Apr. 17, 1990). I therefore concur in the result.

FERNANDEZ, concurring in part and dissenting in part:

I heartily agree with everything in the per curiam opinion except Part A(2), which applies reliance law to the facts of this case, and the ultimate conclusion.

In my opinion, the bankruptcy court erred because it believed that the standard was reasonable reliance, whereas the standard is really justifiable reliance. No doubt the court was led into that legal error because courts have often committed the linguistic error of using the phrase reasonable reliance when they actually meant justifiable reliance. Thus, my disagreement with the per curiam opinion is an exceedingly narrow one, although it could have a substantial effect upon the outcome of this case.

I recognize all that is said about Parks, and I must agree that it seems that he behaved in a very foolish manner. But Parks and Kirsh were friends, even extremely close ones. *See Ophaug*, 827 F.2d at 341; *Phillips*, 804 F.2d at 931. When Kirsh was in need of money, he lied to his friend in order to obtain it. Parks was a professional, but he was also capable of being taken in by friendship. Attorneys are no more exempt from that sentiment than other beings. Of course, Parks *did* know that the Kirshes were slow in paying their bills, but there is nothing to show that he had reason to believe that they would lie to him.

It seems to me that the bankruptcy court failed to consider all of the circumstances of this case and focused, instead, on the way in which a reasonable person would behave. To me the bankruptcy court's thinking is made perspicuous by its statement that "the only reasonable means" of proceeding was the obtaining of a title report, title insurance, and beneficiary statements from the other lenders. That might well delineate a negligence standard. It

does not demonstrate that the only justifiable means of proceeding under these circumstances was by obtaining the reports, statements and insurance. In a word, it does not delineate a justifiable reliance standard. Justifiable reliance does not necessarily require the checking of public records or the performance of other investigations when one is dealing with a very close friend. Therefore, were I the trier of fact I would find Parks' reliance justifiable. I am not, and the opinions of my thoughtful colleagues confirm me in my view that I should not even try to be.

Nevertheless, I would reverse the bankruptcy court because I am satisfied that it applied the wrong standard to a mixed question of fact and law. To paraphrase what we said in *United States v. McConney*, 728 F.2d 1195, 1204 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984): because the legal standard for judging whether reliance is justifiable requires us to determine, by reference to the " 'data of practical human experience' " whether an individual's reliance was justified, "the trial court's findings of fact effectively determine our legal conclusion." Hence, I would reverse and remand for further proceedings in which the trial court would have an opportunity to apply the correct legal standard to the historical facts of this case.

In fine, this case is yet another annotation to Shakespeare's wise injunction: "Neither a borrower nor a lender be,/ For loan oft loses both itself and friend...." [1]

Parks had the Plan lend the Kirshes $40,000. The Plan lost its money and he his friends when they made misrepresentations about the state of their title to a condominium. I would hold that in allowing the Kirshes to discharge their debts to the Plan, the bankruptcy court applied the wrong standard. In determining whether discharge was precluded by 11 U.S.C. § 523(a)(2)(A) the court should have asked whether the Plan "justifiably relied" upon the Kirshes' misrepresentations. Instead,

---

**1.** William Shakespeare, *Hamlet*, Act I, Sc. 3, ll. 75–76 in *The Complete Plays and Poems of William Shakespeare* (W.A. Neilson et al., ed. 1941).

it asked whether the Plan "reasonably relied" and in so doing held the Plan to an improper standard.

Therefore, I dissent to Part A(2) of the per curiam opinion and to its conclusion. In all other respects I concur.