regulations as he finds necessary to carry out the provisions of the Act.

In *Witwer,* the bankruptcy court found that the regulations promulgated by the Secretary of Labor were valid because they were reasonably related to the provisions of ERISA. *Witwer,* 148 B.R. at 936 (citing *Schwartz v. Gordon,* 761 F.2d 864, 868 (2d Cir.1985)). We note additionally that, as provided above, Congress specifically delegated to the Secretary of Labor the authority to enforce the provisions of ERISA. *See* 29 U.S.C. §§ 1131–45.

Therefore, the present facts support the bankruptcy court's finding in this case that the regulatory definition of employee set forth by the Secretary of Labor is consistent with the statutory definition of "employee" in ERISA, as construed by the Supreme Court in *Shumate.*

B. *Whether The Application Of The Law In This Case Deprived The Debtor Of His Due Process Or Equal Protection Rights Under The United States Constitution*

 Watson's claims that his due process and equal protection rights were violated are without merit. The applicable constitutional standard of review will determine the extent to which the bankruptcy court will independently review and scrutinize the legislative line-drawing in the establishment of the applicable classification. Generally, as long as the lawmakers have a "rational basis" for creating the classification in economic and general social welfare legislation, and the classification does not affect a "suspect class," the court will not invalidate the law. *See, e.g., Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971); *Dandridge v. Williams,* 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970).

Watson has not shown that he is a member of a "suspect class" nor has he shown that there is no rational relationship of the regulations to a legitimate governmental purpose. The legislation is economic in nature and the numerous cases discussed above establish that the purpose of ERISA was to protect employee retirement benefits from the reach of persons in control of these retirement funds. No protection is required if the person in control of the funds is also the beneficiary of the funds, and the exclusion of such retirement savings from the scope of ERISA is rationally related to a legitimate governmental purpose.

## V. CONCLUSION

 The debtor's Plan was not ERISA-qualified because the debtor was the owner, sole employee, and sole participant of the Plan and, as such, did not meet the definition of "employee" under ERISA. The Secretary of Labor's regulatory definition of employee is consistent with the statutory definition of "employee" in ERISA which provides that owners do not qualify as employees under ERISA. The Plan is property of the estate and its anti-alienation provision is not enforceable under applicable nonbankruptcy law. The debtor's Plan is therefore subject to Nevada's exemption law and is exempt to the amount of $100,000.

The debtor's due process or equal protection rights were not violated by the ERISA regulation because it was rationally related to a legitimate government purpose, i.e., the protection of employee retirement funds from the reach of persons in control of these funds.

Accordingly, we AFFIRM.

**In re Gerald W. MEDLEY, and Karen E. Medley, Debtors.**

**Karen E. MEDLEY, Appellant,**

v.

**George V. ELLIS, and Albie Ellis, Appellees.**

**BAP No. CC–96–1617–HOV.**

**Bankruptcy No. ND95–10415RR.**

**Adversary No. 95–1291.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted June 18, 1997.

Decided Oct. 30, 1997.

John A. Geiss, Pismo Beach, CA, for Appellant.

Michael E. Sauter, Atascadero, CA, for Appellees.

Before: VOLINN, OLLASON, and HAGAN, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge.

### OVERVIEW

Prior to bankruptcy, the debtor induced an elderly couple to loan her approximately $40,000. She claimed she needed the money to clear IRS liens from property she owned, in order to sell the property. In fact, the debtor did not own any property. When they were not repaid the lenders threatened to sue and the debtor stipulated to judgment and agreed to make monthly restitution payments. After the debtor failed to make payments, she filed a petition for relief in bank-

ruptcy under chapter 7[1] and the plaintiffs filed this nondischargeability action. The court gave collateral estoppel effect to the stipulated judgment and granted summary judgment. The debtor appeals.

### FACTUAL BACKGROUND [2]

In December, 1985, George and Albie Ellis, a retired couple, met Karen Medley who was then working as a seller of timeshare properties in Lupton, Michigan. After the Ellises decided not to purchase a timeshare, Medley approached them about a "more interesting" investment. Medley told the Ellises that she had fallen behind on her federal income taxes and that, as a result, the IRS had recorded liens against real estate she owned (two parcels near Tucson and one in Orange County, California). She told the Ellises that she had purchasers available to buy the property if she could clear the liens. Medley asked the Ellises to give her a short-term loan so that she could clear the titles on her property, sell the property and give the Ellises a "handsome profit." The Ellises made the following loans to Medley: December, 1985, several loans totaling $8,600; January, 1986, two additional loans totaling $25,500; March, 1986, two loans totaling $1,350; and October, 1986, a final $600 loan. These loans were apparently made without any written loan agreement.

By October, 1986, the Ellises were concerned because Medley had not repaid any of the loans. They told Medley they intended to see an attorney about their rights. Medley assured them that the property sales were going forward, but that they were taking longer than she anticipated. She told the Ellises that the loans would be repaid from escrow at a specific bank. At the Ellises' suggestion, Medley agreed to execute a promissory note for approximately $42,000, the amount owed with interest. This reassured the Ellises for some time. However,

by August, 1987, they were again concerned that Medley had not repaid the loans and again stated that they were considering retaining an attorney. Therefore, Medley offered to give them a deed of trust on the three properties. She also told the Ellises that if the properties did not sell by October 15, 1987, she would begin repaying the loan at a rate of $5000 per month.

The Ellises agreed to this and Medley drafted the agreement. She sent the Ellises the addresses of the Tucson properties but said that she did not have the specific location of the Orange County property. Although she informed the Ellises that the properties were secured, she did not provide them with any evidence that the security interest was recorded.

On October 15, 1987, Medley informed the Ellises that none of the properties had sold and, in accordance with their agreement, she sent the Ellises a $5000 check, which was returned for insufficient funds several times. Shortly thereafter, Medley moved to California.

Because of their increasing doubts about Medley, George Ellis drove to Arizona and California to investigate the properties. Title searches in Arizona and California revealed that Medley had never owned any property in the Tucson area or in Orange County; the addresses she gave the Ellises were owned by a relative of Medley's husband. George Ellis also learned that Medley had been arrested in 1982 on charges of fraud and that she had filed a petition for relief in bankruptcy in 1983.

In October, 1988, the Ellises filed suit against Medley in California state court alleging breach of contract and fraud. In negotiations with the Ellises' attorney, Ann Bell Wilson, Medley initially indicated that she would agree to a default judgment that

---

1. Unless otherwise indicated, all references to "chapter" or "section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330; references to "rule" or "Fed.R.Bankr.P." are to the Federal Rules of Bankruptcy Procedure §§ 1001–9036, which make applicable certain Federal Rules of Civil Procedure ("Fed.R.Civ.P.").

2. The following facts are taken principally from Albie Ellis's declaration in support of summary judgment. Although Medley disputed certain facts in her answer to the nondischargeability complaint, she "admit[ted] the truth of plaintiffs' complaint" in the stipulated judgment discussed below and did not dispute the accuracy of any of the underlying facts at the summary judgment hearing.

included $50 in punitive damages. Wilson wanted to include the punitive damages to support a nondischargeability claim if Medley declared bankruptcy. Eventually, Medley and the Ellises agreed to enter into a stipulated judgment for approximately $51,000, including the $45,000 principal, interest, attorneys' fees and $50 in punitive damages. The stipulated judgment provided that Medley "admit[ted] the truth of plaintiffs' complaint which states that she knowingly misrepresented certain facts to the plaintiffs to induce plaintiffs to loan money to her." She also agreed that the debt would not be discharged by a subsequent bankruptcy. The stipulated judgment provided that, pursuant to a covenant not to execute, the Ellises would not execute if Medley made $200 monthly payments.[3] Medley made sporadic monthly payments totaling $1600, but ceased payment in August, 1989. In December, 1989, the Ellises had the judgment entered in state court.

In December, 1995, Medley filed bankruptcy under chapter 7. The Ellises filed a complaint alleging the debt to be nondischargeable under sections 523(a)(2)(A) and (B).[4] In February, 1996, the Ellises filed a motion for summary judgment based on the preclusive effect of the state court judgment. Medley opposed the motion on three grounds. First, she argued that her misrepresentations all concerned her financial condition and thus did not fall within of section 523(a)(2)(A). Second, she argued that the state court judgment was not entitled to collateral estoppel effect. Finally, she argued that the Ellises' reliance on her misrepresentations was not justifiable.

Following a hearing on May 10, 1996, the trial court granted summary judgment under section 523(a)(2)(A).[5] Medley filed this timely appeal.

## ISSUES

Whether plaintiffs are entitled to judgment pursuant to section 523(a)(2)(A).

Whether the plaintiffs justifiably relied on Medley's misrepresentations.

## STANDARD OF REVIEW

The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed de novo. *In re Kirsh,* 973 F.2d 1454, 1456 (9th Cir.1992). Whether a given debt is nondischargeable is a question of law. *Id.* "The determination of justifiable reliance is a question of fact subject to the clearly erroneous standard of review." *Id.*

## DISCUSSION

Although her answer to the summary judgment complaint raised factual issues, neither here nor in her memorandum in opposition to summary judgment did Medley dispute that she made misrepresentations to Ellis. She raises two arguments on appeal. First, she asserts that her conduct does not fall within section 523(a)(2)(A) because her misrepresentations related to her financial condition, which is expressly excluded from that section. Second, in the alternative, she argues that the Ellises did not justifiably rely on her misrepresentations.

*Does Medley's conduct fall within section 523(a)(2)(A)?*

Medley argues first that her conduct is not covered by section 523(a)(2)(A) which ex-

---

3. The Ellises had originally proposed that Medley pay $5000 down with monthly payments of $350, but agreed to the lower amounts.

4. Section 523 provides, in pertinent part, that:
 (a) A discharge under section 727 ... does not discharge an individual debtor from any debt—
 . . . .
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
 (a) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied. . . .

5. The trial court denied summary judgment under section 523(a)(2)(B). The denial was not appealed.

cludes misrepresentations "respecting the debtor's ... financial condition." Medley argues that her misrepresentation that she owned property was a misrepresentation concerning her financial condition and, therefore, not covered by section 523(a)(2)(A). Further, she argues that because she made no written representations to Ellis, her conduct does not fall within section 523(a)(2)(B), which requires a writing.

If her statement that she owned property was the only misrepresentation Medley made to the Ellises, she would perhaps have an argument. In cases decided under the Bankruptcy Act, the Ninth Circuit Court of Appeals has held that a debtor's "implied representation ... that he then had some ownership or control of property ... amounts to a statement 'respecting his financial condition.'" *Scott v. Smith*, 232 F.2d 188, 190 (9th Cir.1956). *See also In re Tenn v. First Hawaiian Bank*, 549 F.2d 1356, 1358 (9th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977) ("We hold that appellants' recordation of the deed which they knew was false for the purpose of obtaining an extension of credit on the basis of an asset that they did not own was a false statement of financial condition within the meaning of 11 U.S.C. § 32(c)(3)."). However, at the summary judgment hearing, the trial court cited other misrepresentations:

> She misrepresented [her] ownership of real estate for purposes of inducing this couple to believe that ... their claim against her would be secured, and she didn't grant them any security interest in real estate, and she didn't own any real estate.
>
> And even if she weren't going to grant them an interest in the real estate, they expected to be paid from—this was a bridge loan to be paid when she sold the property.

A number of courts have addressed the requirements for a misrepresentation concerning the debtor's financial condition. "There are two schools of thought regarding the correct interpretation of the term financial condition. One school holds that the term 'statement respecting the debtor's or an insider's financial condition' is to be strictly construed. The second view holds that a more expansive definition of the term financial statement should be adopted." *In re Olinger*, 160 B.R. 1004, 1007–08 (Bankr. S.D.Ind.1993).

*In re Van Steinburg*, 744 F.2d 1060 (4th Cir.1984), represents a more expansive reading of the phrase. In *Van Steinburg*, a debtor induced a creditor to loan $5,500 by orally assuring him that the loan would be secured by a first priority security interest in certain property. *Van Steinburg*, 744 F.2d at 1060. The court held that the oral representations concerning the encumbrances against the property must be in writing to bar the debtor's discharge. *Id.* at 1061. In arriving at its conclusion, the court reasoned that,

> [c]oncededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those "respecting the debtor's ... financial condition." A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition.

*Id.* at 1060–61. *See also In re Barrack*, 201 B.R. 985, 987–88 (Bankr.S.D.Cal.1996) (stating that oral misrepresentations about the Debtors' ownership of a home, monthly income, value of assets, and ability to service a debt concerned their financial condition).

In *In re Mercado*, 144 B.R. 879 (Bankr. C.D.Cal.1992), the court applied a narrow interpretation of the term. In *Mercado*, a limited partnership entered into an agreement with the debtors to purchase the debtors' interest in real estate on which an apartment complex was to be constructed. The debtors were to oversee the project construction. The limited partnership advanced the debtors their portion of the funds necessary to complete the project. The debtors did not reveal to the partnership the existence of numerous liens on the property. The title report obtained by the partnership did not

reveal the cloud on the title because the debtors had been delinquent for only a short period of time. The partnership lost the property due to a foreclosure sale.

After the debtors filed a voluntary chapter 11 bankruptcy, the partnership challenged the dischargeability of the debt. The court found that the debt was nondischargeable pursuant to section 523(a)(2)(A), and the debtors sought a new trial. The debtors raised essentially the same argument Medley raises here: section 523(a)(2)(A) did not apply because the representation concerned the debtors' financial condition. Since there was no written document, as required by section 523(a)(2)(B), the debtors contended that the debt was dischargeable. The court rejected this argument for at least two reasons. First, the court found that the debtors had made multiple misrepresentations including that the project could be completed by a certain date and how the funds the plaintiffs contributed would be used. The court rejected the *Van Steinburg* interpretation and found that these latter statements did not concern the debtor's financial condition:

> it seems more plausible that Congress intended application of § 523(a)(2)(B) to be limited to "the so-called false financial statement." While a financial statement under § 523(a)(2)(B) may not require the formalities of an audited balance sheet or income statement, nothing in the legislative history indicates that § 523(a)(2)(B) should be expanded beyond statements about a debtor's net worth or overall earning capacity. Thus, the legislative history does not support the holding in *Van Steinburg*.

*Mercado,* 144 B.R. at 882–883 (citing 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); Cong. Rec. S17412 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), *reprinted in* 4 William L. Norton, Jr., *Norton Bankr.L. & Prac.* § 523 at 434–35 (Callaghan)).

■ We need not determine the precise outlines of congressional intent because some

of Medley's admitted misrepresentations, such as her statement that she had buyers waiting to buy the property she did not own or that she intended to repay the Ellises from the sale proceeds, would not fall within even a narrow definition of a statement respecting the debtors' financial condition. Therefore, the trial court correctly determined that § 523(a)(2)(A) applied.

*Did the Ellises justifiably rely on Medley's misrepresentations?*

■ To obtain a judgment of nondischargeability pursuant to section 523(a)(2)(A), a creditor must prove the following: (1) that the debtor made the representations; (2) that at the time he knew they were false; (3) that he made them with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representations; (5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made. *In re Kirsh,* 973 F.2d 1454, 1457 (9th Cir.1992) (citing *In re Britton,* 950 F.2d 602, 604 (9th Cir.1991)). See *also Field v. Mans,* 516 U.S. 59, ——, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995) ("[W]e hold that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance.").

Medley does not dispute that the Ellises have proven four of the five elements; rather, she argues that the Ellises have not proved the fourth element because, according to Medley, their reliance on her misrepresentations was not justifiable.

She relies largely on *Kirsh.*[6] In *Kirsh,* the debtor, prior to bankruptcy, borrowed $40,000 from his good friend and attorney. The loan was secured by a deed of trust on the debtor's condominium. The debtor represented that the condominium, which was worth $240,000, had one outstanding mortgage, for approximately $140,000. The lender, who was an attorney with twenty years experience in business and real estate law, did not obtain a title report. After the holder of the first trust deed foreclosed on the

---

**6.** Medley also cites to *In re Phillips,* 804 F.2d 930 (6th Cir.1986) and *In re Ophaug,* 827 F.2d 340 (8th Cir.1987). These cases found debts nondischargeable on facts fairly similar to *Kirsh.* How-

ever, these cases are not particularly relevant here because the courts were not applying a justifiable reliance standard.

condominium, the lender learned the debtor had borrowed $120,000 secured by a second deed of trust one month before he had borrowed the $40,000.

The Ninth Circuit Court of Appeals rejected the lender's argument that the debt should be nondischargeable because his reliance had not been justified:

> Lenders do not merely rely upon the representations of borrowers. That is especially true when the lender knows that the borrower is having financial difficulties and does not always pay his bills in a timely fashion ... Obtaining a title report is a simple and not overly expensive proposition.

*Kirsh*, 973 F.2d at 1461. Medley argues that because the parties were strangers and because the details of the loans were unclear, the Ellises did not justifiably rely on her statements.

 The standard for determining whether reliance is justifiable "is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves." *Kirsh*, 973 F.2d at 1458. "[T]he standard does protect the ignorant, the gullible, and the dimwitted...." *Id. See also Kirsh*, 973 F.2d at 1459 (stating that "[i]t is only if 'the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable' that he will be denied recovery—a person cannot purport to rely on preposterous representations or close his eyes 'to avoid discovery of the truth ...'")(quoting *Seeger v. Odell*, 18 Cal.2d 409, 115 P.2d 977, 981 (1941)). *Accord, Field*, 516 U.S. at —— and n. 12, 116 S.Ct. at 446 and n. 12 ("Naifs may recover, at common law and in bankruptcy....").

The Ellises argue that they were unsophisticated investors and their actions reveal this to be so. Medley has not shown that they were more sophisticated or experienced than they claim. Rather, Medley focuses exclusively on the lack of a personal history between the parties and the Ellises' lack of diligence in investigating Medley's claims. However, this case falls squarely within the rule that " 'no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " *Kirsh*, 973 F.2d at 1458 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 108 at 751 (5th ed.1984) (footnote and citation omitted)).

## CONCLUSION

The debtor's misrepresentations induced an unsophisticated elderly couple to loan her money. These misrepresentations fall within the ambit of section 523(a)(2)(A). The trial court correctly found that the Ellises justifiably relied on these misrepresentations. Therefore, the trial court's entry of summary judgment against Medley is AFFIRMED.