In re Erik DAKOTA, Debtor.

**Dakota Steel, Inc., Plaintiff,**

v.

**Erik Dakota, Defendant.**

**Bankruptcy No. 99–57941–ASW.
Adversary No. 00–5028.**

United States Bankruptcy Court,
N.D. California.

Oct. 4, 2002.

Henry B. Niles, III, Law Offices of Henry B. Niles, III, Santa Cruz, CA, for debtor.

Thomas J. LoSavio, Low, Ball and Lynch, San Francisco, CA, for plaintiff.

Michelle K. Rubin, Law Offices of Michelle K. Rubin, Santa Cruz, CA, for trustee.

## MEMORANDUM DECISION AFTER TRIAL

ARTHUR S. WEISSBRODT,
Bankruptcy Judge.

Before the Court are a complaint by Dakota Steel, Inc. ("Creditor") against Erik Dakota ("Debtor"),[1] and a counterclaim by Debtor against Creditor.

Creditor's complaint seeks judgment for money damages based on tort, and a determination that such debt is non-dischargeable pursuant to Bankruptcy Code § 523(a)(2)(A), and/or (4), and/or (6). Debtor's counterclaim seeks a money judgment for debts represented by promissory notes.

Creditor is represented by Thomas J. LoSavio, Esq. of Low, Ball & Lynch, and Debtor is represented by Henry B. Niles, III, Esq. The matter has been tried and submitted for decision. This Memorandum Decision constitutes the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### FACTS

Creditor is a corporation that was formed in 1993 by Debtor, Roland Loomis ("Loomis"),[2] Richard Wolfe ("Wolfe"), and Stanley Cryz ("Cryz"), with each holding a 25% interest.[3] Wolfe and Cryz each contributed $5,000 for their shares, and each also made initial loans of $10,000 to the corporation. Debtor's contributions were the assets of his sole proprietorship, through which he had been designing and manufacturing "body piercing jewelry" since 1989; he also designed and produced such jewelry for sale by the corporation, and handled its daily business affairs. Loomis' contribution was his twenty years' experience and international reputation as "Fakir Musa Far", whom he claimed to be an originator of "the contemporary custom of body piercing" in Western culture; he also assisted with marketing efforts through classes and seminars that he conducted, and drew on his experience running advertising agencies for over fourteen years.

Loomis and Debtor met in 1989 or 1990, when Debtor was one of Loomis' first students; Debtor considered Loomis to be his "mentor" and acted as an instructor at Loomis' school.[4] They both wanted to pro-

---

1. Debtor is the bankruptcy debtor in this Chapter 7 case. Unless otherwise noted, all statutory references are to Title 11, United States Code ("Bankruptcy Code"), as applicable to cases commenced on December 15, 1999.

2. Loomis' first name is spelled "Rolend" in the trial transcripts, but it appears as "Roland" on all documents in evidence, including those written and signed by him.

3. At some unspecified point, Wolfe acquired Cryz' shares and thus held a 50% interest, while Debtor and Loomis each continued to hold a 25% interest.

4. Prior to that time, Debtor's employment had consisted of working as a plumber and carpenter, and a part-time job as a "helper" at the Post Office. Apart from operating his sole proprietorship, Debtor had no business expe-

duce better quality jewelry than was widely available at that time, but lacked capital. Debtor considered borrowing from his family, but Loomis suggested borrowing from Loomis' friend Wolfe, who had both business experience and funds for investment—Debtor testified that Loomis said Wolfe was "a very wealthy man" who could make a loan and "probably would never ask for it back". Loomis also suggested Cryz, a physician whose medical knowledge might be useful. Debtor testified that Loomis said the business should be incorporated to "protect" Wolfe's loans, and that the stock would be "given back" to Debtor once those loans were paid off. Debtor testified that all parties treated the corporation "as a family business, just a small, on a handshake, casual—casual business".

The corporation's business was conducted out of premises in Soquel that were leased in Debtor's name. Loomis testified that the first few year were "a struggle" because the business was "too successful" with sales and had difficulty in filling orders—additional cash was needed, and Wolfe made "three or four" loans after his first. Production improved as the business acquired more and better equipment, with profits commencing in 1996 and continuing through 1997. In fact, the corporation's accountant noted that the 1997 net profits were so high they should be reduced for tax purposes, which was accomplished by paying off several debts and giving Debtor a bonus of $80,000.

Before the corporation began to earn profits, Debtor twice agreed to defer salary. The evidence includes copies of three promissory notes by the corporation to Debtor:[5]

1/ "Note A", dated December 31, 1996, for $28,838.49, payable on demand plus interest at 10% from January 1, 1997. It recites that:

> ... as collateral security for the payment of this Note, [Debtor] shall at all times have and is hereby given a lien upon and right of offset against all tangible assets of [the corporation]. On the occurrence of any failure to pay any portion of this Note or all of it upon the demand of [Debtor], he shall have the right to sell all or part of the collateral of this Note, at public or private sale, without any demand, notice, or advertisement, all of which are expressly waived, and [Debtor] retains the right to purchase any such collateral security at any such sale free from any right of redemption on the part of [the corporation].

It also recites that the prevailing party in any legal action necessary to enforce or collect the note is entitled to reasonable attorneys' fees. The note is signed by Debtor as corporate President and by Loomis as corporate Secretary—it is annotated by Loomis "approved and signed 2/97". Loomis testified that this note was paid, and included $17,392 for the agreed-upon value of Debtor's original contribution in the form of his sole proprietorship business; the balance of the note was for Debtor's first deferred salary, and for interest. Debtor testified that this note was not paid.

---

rience—he left school in the seventh grade and attended junior college "a little while", where he received a Construction Technology Certificate.

5. The notes are not on printed forms but they all use the same language and the provisions of each are identical (including the interest rate), except for dates and amounts of principal. The same language, provisions, and interest rate appear in corporate notes to Wolfe and Cryz.

2/ "Note B", dated December 31, 1996 for $53,791, payable on demand plus interest at 10% from January 1, 1997. It includes the same provisions for collateral and attorneys' fees as does Note A. The note bears signature lines for the corporate President and for the corporate Secretary, but has no signatures—the note is annotated by Loomis "Note not approved or signed". Loomis testified that this note was not approved by the corporation because there was no agreement to pay interest, which was included in the note erroneously due to "major problems with our CPA".

3/ "Note C" dated January 1, 1997 for $37,427, payable on demand plus interest at 10% from January 1, 1997. It describes the principal sum of $37,427 as consisting of:

> ... $17,392 outstanding from June 11, 1993 plus accrued interest on that principal balance & the deferred salary of $53,791 (paid December 31, 1996). The accrued interest owing as of December 31, 1996 is $20,035 plus $17,392 principal for a total of $37,427.

It includes the same provisions for collateral and attorneys' fees as do Note A and Note B. Note C bears signature lines for the corporate President and for the corporate Secretary; the copy introduced into evidence by Creditor includes no signatures; the copy introduced into evidence by Debtor includes signatures purporting to be those of Debtor (as corporate President) and of Loomis (as corporate Secretary)—the note is annotated by Loomis "Note not approved or signed". Loomis testified that this note was not approved by the corporation because there was never an agreement to pay interest accrued to December 31, 1996, and the $17,392 amount had already been paid as part of Note A. Debtor testified that he received the note from Loomis with the signatures on it.

The minutes of a corporate meeting on December 18, 1996 state:

> ITEM 4 & 5:
>
> It was unanimously agreed and a Resolution passed that [Debtor] should be paid for his initial dba investment and deferred compensation for 1993, 1994, and 1995, plus appropriate interest by December 31, 1996. [Debtor] expressed a desire to reinvest this amount, less personal taxes, in the company and take promissory notes for the balance. Total for this amount to be calculated by Anne Mitchell before 1996 April tax filing deadline. Notes to be issued to correct amounts.
>
> (Secretary's Post–Meeting Addendum)
>
> February 5, 1997: Secretary receives accounting for [Debtor's] notes. Total is $91,218 and appears incorrect. On checking, secretary discovers [Debtor's] personal income taxes due for 1996 have not been deducted from totals. Another accounting is requested. (Attachment C)
>
> February 25, 1997: Second accounting for [Debtor's] notes is submitted for issuance of Promissory Notes and finalization of the Resolution. The total amount this time is $66,265 and appears to be correct.

A letter dated February 24, 1997 addressed to the corporation by Anne Mitchell, CPA, states:

> Enclosed please find Promissory Notes to [Debtor], to be signed by the Officers of the Corporation.

> The Note dated December 31, 1996 is for the deferred salary declared paid to [Debtor] at December 31, 1996 which he has lent back to the corporation due to operating cash flow needs. The balance due on that note is $28,838

The balance due on the Note dated January 1, 1997 is comprised of 2 separate elements:

| | |
|---|---:|
| the principal balance due [Debtor], outstanding since June 11, 1993 (see attached supporting documentation) | $17,392 |
| the accrued, unpaid interest on the principal balance resulting from [Debtor] transfer to the corporation on June 11, 1993 (above) and on the deferred salary of $53,791 (paid on December 31, 1996). | $20,035 |
| Balance due [Debtor] on Note dated Jan. 1, 1997 | $37,427 |
| The total due to [Debtor] January 1, 1997 | $66,265 |

The Mitchell letter includes copies of Note A and Note C, both with what purport to be the signatures of Debtor as corporate President and of Loomis as corporate Secretary. Loomis testified that corporate meetings were held at least quarterly, some by telephone but most with the members physically present. As corporate Secretary, Loomis' practice was to make notes during a meeting, discuss them with others who attended to be sure that everyone considered the notes complete, and then prepare minutes from the notes a day or two after the meeting; he would sometimes insert an "addendum" to reflect events that occurred after a meeting. Loomis testified that he prepared the various minutes that were introduced into evidence.

In 1998, the corporation began to lose business due to increased competition from imported products being sold for less than the corporation's prices. Loomis testified that the members agreed "our accounting was in a shambles"; the minutes of the August 6, 1998 meeting show that the corporation's accountant noted "a large discrepancy" between the books and tax depreciation schedules, and suggested that an accounting "cleanout" be undertaken to establish accurate figures. It was agreed that an equipment inventory be made because there were no records of what had been acquired.

Debtor testified that, at some point in 1998, after Wolfe's loans had been paid in full with interest, Debtor telephoned Loomis and said that he would like his notes to be paid off too, and would "like to have my stock back"—he said that Loomis laughed and said that "he was making too much money off me". Debtor then telephoned Wolfe with the same request, and was turned down.

On August 18, 1998, Debtor telephoned Loomis and reported that he was resigning—the testimony differs as to what else was said. Loomis testified that he was "in absolute shock" at the news, and told Debtor that time was needed to find someone else to run the business and to negotiate the possibility of Debtor buying the other members' shares; he said that Debtor agreed to stay as General Manager until a "buyout price" could be negotiated or a replacement found. According to Debtor, there was no discussion about him staying. Debtor testified that he told Loomis "running this company is destroying our friendship" and Debtor had made the "difficult decision" to resign—he said that Loomis was "glad", because Loomis "was looking for a way out of the business himself", and he was "very, very supportive". Debtor testified that he then telephoned Wolfe, who asked whether there was "something we can do", but Debtor said "we've been trying", and that was

"okay" with Wolfe. Later that same day, Debtor sent two letters to the corporation by means of facsimile transmission, with a copy of each to Loomis and to Wolfe. One letter stated that Debtor resigned, effective upon close of business on August 31. The other made demand for payment of the promissory notes dated December 31, 1996 and January 1, 1997, asking that the sum of $96,956.64 be paid by August 25, 1998 (consisting of $66,265 principal and $30,691.64 interest); Loomis testified that the corporation did not honor the demand.

The testimony differs as to what happened next. Loomis testified that, a few days after the telephone conversation of August 18, Debtor said that he wanted to put some old equipment in storage but Loomis was "firmly against" moving anything until it had been inventoried because "nobody knew what was there" and "it could just disappear into space" without an inventory. Loomis said that Debtor led him to believe that the corporation's business premises were available indefinitely under a month-to-month tenancy, with "no great urge or pressure to get out"—Loomis did not know what arrangements Debtor had made with the landlord and received no information when he asked Debtor for the landlord's name and telephone number. Loomis said that Debtor never told him that Debtor intended to take the corporation's equipment into custody because it was collateral for a debt that Debtor believed he was owed by the corporation. According to Debtor, the conversation about the equipment was initiated by a call from Loomis, who said that he did not want to continue the business and wanted to "give" it to Debtor; they also discussed the fact that the premises lease had expired in June 1998 and Debtor would have to move the equipment into storage.

Loomis testified that he and Wolfe went on vacation shortly after the August 18, 1998 telephone conversation. When they returned on September 2, Loomis could not reach Debtor at the business premises and received no information from the only available employee—Loomis later learned from someone whose name he did not recall that the corporation's equipment had been moved to San Jose; he never discussed the matter with Debtor. Debtor testified that he moved the equipment on September 1 or 2 and put it in a separate locked room at a "loading bay"; he commenced operating another business at that location but did not use the corporation's property and kept it segregated from his own. The parties agree that the property Debtor took from the corporation's premises consisted of the shop and office equipment, inventory, customer information, and a truck. Debtor testified that the property remained in storage at time of trial, and that he had paid all storage expense. Debtor further testified that he would have given the corporation any of the property that was needed for operations if the corporation would agree to pay him at least part of what he was owed, on negotiated terms, but he was never asked for it. Debtor testified that neither Loomis nor Wolfe ever asked for turnover, or inspection, of any of the property.

Debtor commenced his new business immediately upon resigning from the corporation on August 31; he first used the name "Dakota Designs" but stopped after two or three days when Loomis and Wolfe objected, and changed the name to "New Vision". He testified that he used the corporation's phone number until September 10. Debtor said that he had previously assisted in designing a catalogue of the jewelry produced by the corporation, which he modeled after the "general format and layout" used by the firm Body Manipulation—when he left Dakota Steel he again used the Body Manipulation catalogue as a "template" for one featuring his

new business' products. After a "short while", Debtor had a different printer design an entirely new catalogue for New Vision. After Debtor left the corporation, he offered some of the same jewelry designs that had been offered by the corporation but he testified that the designs did not belong to the corporation or to Debtor, and had been created by a friend who sold them through his own company. Loomis testified that most of the designs shown in the corporation's catalogue were "unique" in the sense that Debtor developed ways to make better jewelry, but the designs were not patented and were copied by others. Debtor testified that the jewelry sold by the corporation was "generic". No independent expert was called to testify by either side. There was no evidence that any of the jewelry designs were protected by patents or trademarks.

The parties stipulated to an offer of proof that, if Eve Zamora ("Zamora") were to testify, she would say that she placed an order no more than two weeks prior to September 2, 1998 and believed that she had placed it with the corporation, but realized later when she received the Dakota Designs catalogue that the order had been filled by Debtor's new business; she would also say that she once worked for Loomis. Debtor testified that he filled Zamora's order on September 2 and did so with jewelry that he acquired from a firm in Arizona. Debtor said that he did not use the corporation's customer list in his new business, but "built" his own with 1,000 names from the internet, 2,000 names from a friend's jewelry company, 4,000 names purchased from sellers of telephone directory listings, and "a handful" of names from his personal address book (including the name of Zamora, who was a friend); after removal of duplicates, he had a list of 5,000 names. Debtor said that he put the corporation's customer list in storage with the rest of the property; he believed that it had approximately 1,000 names on it and there was probably some overlap with his new list, but he did not use the 1,000 names and would have had no reason to do so, because he had 5,000 names of his own.

Debtor testified that the corporation had approximately fifteen to twenty employees, and Debtor did not tell them that he was leaving until the day of his resignation. He said that he did not ask any of them to join his new business, but some did, maybe "tenish". Debtor testified that the new business lost money due to foreign competition and eventually had to cease operations.

Both Loomis and Debtor testified about the corporation's finances, and copies of many records were introduced, but the evidence on that subject was largely inconclusive. Loomis had experience with financial matters but little knowledge about the corporation's affairs, while Debtor had no accounting background, was not good at "numbers", and said that he relied on others to maintain records and did not understand the books. The evidence showed that the corporation had at least two accountants and a bookkeeper but none of them testified, nor did Wolfe. The evidence did not establish that the corporation was insolvent at the time Debtor left, inasmuch as the August 1998 balance sheet shows assets of $199,037 and liabilities totalling $99,812 (without evidence as to how these amounts were calculated). Nor did the evidence establish that Debtor used corporate cash for his own benefit, inasmuch as Debtor showed that the funds on deposit when he left were applied to cover corporate expenses, including a payment of $10,000 to Loomis for "some bill that he

presented".[6]

## II.

### ANALYSIS

#### A. Creditor's Complaint

Creditor's complaint seeks relief under both non-bankruptcy law (generally, California state law) and bankruptcy law. When Debtor filed bankruptcy on December 15, 1999, no court had determined whether Debtor was indebted to Creditor at all, and, if so, in what amount. Creditor's complaint therefore seeks both a judgment finding Debtor liable to Creditor for damages in an amount to be proven, and a determination that such judgment debt is excepted from discharge pursuant to § 523(a)(2)(A), and/or (4), and/or (6).

With respect to non-bankruptcy law, Creditor has filed two pre-trial briefs and a post-trial brief without clearly stating a basis for either liability or damages, despite the Court having asked more than once that such issues be addressed in detail.[7] Both the complaint and the briefs use terms such as "infringement" of "trade name", "fraud", "deceit", "misappropriation", "trade secret", "conversion", "breach of fiduciary duty", "defalcation by a fiduciary", "embezzlement", "larceny", and "punitive damages"—non-bankruptcy authority is cited for general propositions but elements of specific torts are not stated and associated with particular facts, and the measure of damages is neither clearly identified nor supported. Creditor's failure to define a basis under non-bankruptcy law for liability and damages leaves the Court in the position of surmising what (if any) torts that Creditor expresses or implies may be constituted by Debtor's alleged conduct, and what (if any) damages Creditor might be entitled to as a result.

However, it is not necessary to undertake such an exercise in order to rule on Creditor's complaint, nor to call for further briefing now, because the complaint also seeks a determination of dischargeability for whatever debt might exist—if the dischargeability issues are ruled on first, it could develop that issues concerning the nature and extent of Creditor's claim would become moot. If it is determined that the facts proven at trial would not except a debt from discharge, then the nature and extent of the debt would be irrelevant, and it would be unnecessary to decide whether Debtor owes some amount of damages measured in some fashion for one or more state law torts suggested by the facts of the case.[8] If, however, it is

---

6. Loomis testified that he was unable to obtain complete information about the corporation's bank accounts from the bank, despite a corporate resolution made on September 29, 1998 transferring Debtor's control of the accounts to Loomis. Loomis said that the bank had not kept copies of all cancelled checks, so the copies of the account statements were "useless or meaningless". While it is possible that a bank would fail to have copies of cancelled checks drawn on one of its accounts, this Court considers it more likely than not that copies would normally be available.

7. It was stated in argument that, before bankruptcy was filed, Creditor sued Debtor in State Court seeking money damages for loss of corporate property, and testimony alluded to the existence of such an action, but the evidence includes no copy of such a complaint.

8. If there were no exception to discharge, Debtor's bankruptcy discharge would protect him from *any* debt to Creditor, so the amount of the unenforceable debt would be irrelevant. The bankruptcy estate is not affected by any such debt, because Creditor filed no proof of claim, the Chapter 7 Trustee has filed a report of "No Assets", and the bankruptcy case has been closed (Debtor claimed his counterclaim against Creditor exempt and such claim was allowed; further, such claim was scheduled and therefore deemed abandoned pursuant to § 554(c) when the case was closed).

determined that the facts proven would except a debt from discharge if such a debt existed, then the Court could turn to the nature and extent of the excepted debt. Accordingly, the applicable facts for purposes of this Memorandum Decision are those set forth above, and the applicable law is that governing exception of debts from discharge, discussed below.

## (1) Standards

■ The Bankruptcy Code is "designed to afford debtors a fresh start, and we interpret liberally its provisions favoring debtors.", *In re Bugna*, 33 F.3d 1054, 1059 (9th Cir.1994) ("*Bugna*"). The Code's limited exceptions to the general policy of discharge are found in § 523(a) and are to be construed narrowly, *In re Riso*, 978 F.2d 1151 (9th Cir.1992). The plaintiff in an action for determination of dischargeability under § 523(a) bears the burden of proving all elements of the claims for relief asserted by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The intent that must be shown for a determination of non-dischargeability under § 523(a) is actual intent, not merely intent implied in law, or constructive intent; the requisite intent may, however, be inferred from the totality of the surrounding circumstances, *In re Anastas*, 94 F.3d 1280 (9th Cir.1996).

## (2) § 523(a)(2)(A)

■ A debt arising from fraud "other than a statement respecting the debtor's or an insider's financial condition" is excepted from discharge pursuant to § 523(a)(2)(A). This statute requires a showing of actual fraud rather than constructive fraud or fraud implied in law, and the elements of a claim under this subsection are:

(1) a representation made by the debtor;

(2) known by the debtor at the time made to be false;

(3) made with the intention and purpose of deceiving the creditor;

(4) upon which the creditor justifiably relied;

(5) which proximately caused damage to the creditor.

*In re Kirsh*, 973 F.2d 1454 (9th Cir.1992) ("*Kirsh*"); *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ("*Field*").

■ The requisite false representation can take the form of an omission, as explained by *In re Harmon*, 250 F.3d 1240, 1246 n. 4 (9th Cir.2001):

A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive. *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089–90 (9th Cir.1996).

And see *In re Howarter*, 114 B.R. 682, 685 n. 2 (9th Cir. BAP 1990):

Although not raised as an issue on appeal, we note that silence or concealment of a material fact can create a false impression that constitutes a misrepresentation actionable under section 523(a)(2)(A). *Minority Equity Capital Corp. v. Weinstein (Matter of Weinstein)*, 31 B.R. 804, 809–10 (Bankr. E.D.N.Y.1983) (citations omitted); see also *Haddad v. Haddad (In re Haddad)*, 21 B.R. 421, 423–24 (9th Cir. BAP 1982) (rejecting the trial court's conclusion under section 523(a)(2) that fraud cannot be implied from a failure to volunteer information), *aff'd without opinion*, 703 F.2d 575 (9th Cir.1983).

■ As for the element of reliance, the type required prior to *Kirsh* was "reason-

able" as determined by an objective standard, *see In re Siriani,* 967 F.2d 302 (9th Cir.1992); under *Kirsh,* the only reliance that need be shown is "justifiable", a standard that is in large part subjective:

> ... the standard is not that of the average reasonable person. It is a more subjective standard which takes into account the knowledge and relationship of the parties themselves. Thus, "a person of normal intelligence, experience and education ... may not put faith in representations which any such normal person would recognize at once as preposterous...." At the same time, the standard does protect the ignorant, the gullible, and the dimwitted, for " 'no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " [citation omitted]. On the other hand, if a person does have "special knowledge, experience and competence" he may not be permitted to rely on representations that an ordinary person would properly accept. [citation omitted]

*Kirsh,* at 1458. The *Kirsh* standard of justifiable reliance was adopted by the United States Supreme Court in *Field.*

■ Creditor does not allege that Debtor affirmatively misrepresented anything, but does contend that Debtor made a misrepresentation by failing to disclose his intent to leave, take the corporation's property, and start a competing business.[9] As noted above, failure to disclose material facts that one is under a duty to reveal can constitute a fraudulent misrepresentation for purposes of § 523(a)(2)(A). Creditor cites *Bancroft–Whitney Co. v. Glen,* 64 Cal.2d 327, 411 P.2d 921, 49 Cal.Rptr. 825

(1966) ("*Bancroft–Whitney*") for the proposition that a corporate officer/director bears a duty to disclose an intent to leave and go into competition, but the holding of that case is not quite so sweeping:

> There is broad language in some cases to the effect that protection of the corporation's interest requires full disclosure of acts undertaken in preparation for entering into competition. [citations omitted] An analysis of these cases indicates, however, that the liability for breach of fiduciary duty was not predicated on the officer's mere failure to disclose such acts, but upon some particular circumstance which rendered nondisclosure harmful to the corporation or upon the officer's wrongful conduct apart from the omission. [footnote omitted]

*Bancroft–Whitney,* at 346–47, 49 Cal.Rptr. 825, 411 P.2d 921

> There is no requirement that an officer disclose his preparations to compete with the corporation in every case, and failure to disclose such acts will render the officer liable for a breach of his fiduciary duties only where particular circumstances render nondisclosure harmful to the corporation. [citations omitted]

*Bancroft–Whitney,* at 347, 49 Cal.Rptr. 825, 411 P.2d 921. It is undisputed that Debtor did disclose his intent to leave, by both telephone and letter on August 18. There is no evidence that Debtor told Loomis or Wolfe on or after August 18 what he intended to do when he left, nor that they asked him—but Debtor did testify without contradiction that he told them both, earlier in the year, that he wanted to

---

9. Creditor acknowledges that Debtor had no non-competition agreement with the corporation and therefore was free to compete, but argues that Debtor was not entitled to compete in a "confusingly similar manner". The manner in which Debtor competed may or may not constitute some kind of tort under non-bankruptcy law, but is not relevant to the issue of non-dischargeable fraud under § 523(a)(2)(A).

acquire all of the stock in the corporation, which should have put them on notice that he did not expect to stop working in the field. There is no evidence that Debtor purposely concealed from Loomis and Wolfe whatever plans he had to start his own business of the same kind—indeed, it is likely that they must have realized, or at least suspected, as much when he announced his resignation, since Debtor had been engaged in such work since 1989 and was the only one of the three who did that work at the corporation. Furthermore, Debtor did not compete with the corporation, because the corporation did no business after he left—and the evidence does not show that it was Debtor who prevented the corporation from functioning. Rather, it appears that neither Loomis nor Wolfe had any interest in continuing with the corporation's business once Debtor had gone—the evidence shows only that they objected to Debtor's use of a business name that was similar to the corporation's name, not that they made any effort to locate a new designer/manufacturer or manager to perform any of the services that Debtor had provided, or that they attempted to recover possession of the property from storage and use it (in fact, they went on vacation shortly after learning of the resignation). The complete lack of activity by Loomis or Wolfe after being informed of Debtor's resignation, and even after the resignation took place, leads to the conclusion that there was not "some particular circumstance which rendered nondisclosure [of Debtor's intent to go into the same kind of business] harmful to the corporation"—instead, the impression is that Loomis and Wolfe did not want to do whatever was necessary to run the corporation's business without Debtor, and thus ceded the field to anyone who did want to engage in that business, including Debtor.

Even though Debtor may not have expressly announced his plans, Loomis and Wolfe never asked him to, either before he left or afterwards—he had no duty to do so under the facts of this case and the test of *Bancroft–Whitney,* and any failure to do so was not fraudulent concealment of a material fact with intent to deceive, such as is required by § 523(a)(2)(A).

Nor is the element of justifiable reliance present. It is undisputed that there was no non-competition covenant, or long-term employment contract, or even an informal promise that Debtor would work only for the corporation, so Loomis and Wolfe could not have relied on assurances of that kind to think that Debtor would never leave and compete. Loomis admits that Debtor announced his resignation by telephone on August 18, and Debtor sent a letter to Loomis and Wolfe that same day by facsimile transmission, stating that the resignation would be effective at the close of business on August 31. Loomis claims that Debtor said on the telephone that he would stay until a replacement was found or a buy-out was negotiated, which Debtor denies—Debtor's testimony was credible on this subject, and consistent with his behavior. Assuming solely for the sake of argument that Loomis is correct, the fact remains that Debtor's letter sent by facsimile transmission on the same day said that he would not stay indefinitely but only until August 31, so Loomis cannot claim to have been misled or lulled to his detriment by the promise allegedly made in the telephone conversation.

Creditor has not established non-dischargeable fraud under § 523(a)(2)(A).

### (3) § 523(a)(4)

A debt arising from fraud [10] or defalcation by one acting in a fiduciary capacity,

---

**10.** The complaint's allegation of fraud by a

fiduciary under § 523(a)(4) is superfluous,

or embezzlement or larceny, is excepted from discharge pursuant to § 523(a)(4).

### (a) Fiduciary Defalcation

 The "fiduciary capacity" referred to by § 523(a)(4) is not the kind of general fiduciary status often found in non-bankruptcy law based on a relationship of trust and confidence, but must be equivalent to the position occupied by the trustee of an express trust, *see Ragsdale v. Haller,* 780 F.2d 794 (9th Cir.1986) ("*Ragsdale*"); an express trust is not one created by law merely as the result of wrong-doing (such as a constructive trust), *see In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981) ("*Pedrazzini*"). For example, a general partner of a California partnership was held by *Ragsdale* to be a fiduciary to the partnership and its partners with respect to partnership assets for purposes of § 523(a)(4) because California caselaw treated partners as trustees of express trusts—but a corporation's officer, director, or controlling shareholder has been held to lack fiduciary status toward the corporation for purpose of § 523(a)(4) because California caselaw treats corporate principals as agents rather than as trustees, *see In re Cantrell,* 269 B.R. 413 (9th Cir. BAP 2001) ("*Cantrell*").

 Despite *Cantrell,* Creditor argues that Debtor was a fiduciary to the corporation by virtue of being a corporate officer and director. Creditor urges that *Cantrell* should not be followed because it includes *dicta* and misapplies *Bainbridge v. Stoner,* 16 Cal.2d 423, 106 P.2d 423 (1940) ("*Bainbridge*"). This Court does not agree with Creditor because the salient point about both *Cantrell* and *Bainbridge* is that California law treats the

relationship between a corporation and its principals as one of agency, rather than viewing the principals as the trustees of an express trust with a *res; see, e.g., Bancroft–Whitney* and *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.,* 83 Cal.App.4th 409, 99 Cal. Rptr.2d 665 (2000). As *Ragsdale* makes clear, the treatment afforded by a state's courts in applying the state's law determines the issue of whether any given role is equivalent to that occupied by the trustee of an express trust with a *res. Cantrell* correctly followed the decision of the California Supreme Court in *Bainbridge* and those of other California courts to find an agency relationship between a corporation and its principals rather than a trust relationship, and *Ragsdale* holds that no fiduciary capacity can exist under § 523(a)(4) without a trust relationship.

 *Cantrell* states (at 422, n. 10) a possible exception to the general rule, when a fiduciary duty is claimed by a creditor of an insolvent corporation:

Although not cited by either side, we recently held in *In re Jacks,* 266 B.R. 728 (9th Cir. BAP 2001), that "California's Corporation Code provides a remedy for an insolvent corporation's director's violations of fiduciary duties to creditors," which could be actionable under § 523(a)(4). *Id.* at 737. We also noted: "Because a director's fiduciary duties to creditors do not arise until the corporation is insolvent, the timing of the insolvency is critical." *Id.* at 738. Since the issue of insolvency was not raised by the [Plaintiffs], and because they are not creditors, *Jacks* is not relevant to the case before us.

---

since fraud is also alleged under § 523(a)(2)(A). Actionable fraud under § 523(a)(4) must be fraud committed by a fiduciary, but does not otherwise differ from

the actual (as opposed to constructive or legally implied) fraud to which § 523(a)(2)(A) pertains, *see Bugna,* and *In re Roussos,* 251 B.R. 86, 91 (9th Cir. BAP 2000).

*Jacks* is not relevant to this case either. First, Debtor's fiduciary status is asserted by the corporation, not by one of the corporation's creditors, and *Jacks* applies to the fiduciary duty that is owed to creditors. Second, the corporation was not shown to have been insolvent at the time Debtor left and put the property into storage—Creditor argues that the corporation *became* insolvent when Debtor took all of its assets, but *Jacks* points out that "the timing of the insolvency is critical" because it is the insolvency that creates the duty in the first place; *and see Pedrazzini*, holding that a trust relationship must exist before the wrong and not arise as a result of it. Therefore, the possible *Jacks* exception to the rule stated by *Cantrell* does not apply here.

 Accordingly, Debtor was not a fiduciary to the corporation within the meaning of § 523(a)(4). However, even if the requisite fiduciary capacity were found to exist, Debtor has not been shown to have committed defalcation. In the context of § 523(a)(4), "the term 'defalcation' includes innocent, as well as intentional or negligent defaults so as to reach the conduct of all fiduciaries who were short in their accounts", *In re Lewis*, 97 F.3d 1182, 1186 (9th Cir.1996)—if a creditor establishes that a debtor occupied a fiduciary capacity, the burden shifts and it is the debtor's burden to show that defalcation did *not* occur, by accounting for the *res*, *see In re Niles*, 106 F.3d 1456 (9th Cir. 1997). Debtor has not failed to account for the corporate property that he took. With respect to funds on deposit in the corporate bank account, Debtor showed that he applied them to corporate purposes and Creditor did not show otherwise. With respect to everything else, Debtor testified that he put it all into storage where it has remained ever since—Creditor has not shown otherwise, and admits never having asked to inspect the property. According-

ly, even if Debtor had occupied a fiduciary capacity toward the corporation within the meaning of § 523(a)(4), he was not shown to have committed defalcation.

### (b) Embezzlement or Larceny

 The elements of a claim based on embezzlement are:

(1) property owned by another is rightfully in the possession of debtor;

(2) debtor's appropriation of such property to a use other than the use for which the property was entrusted to debtor; and

(3) circumstances indicating fraud.

*In re Littleton*, 942 F.2d 551, 555 (9th Cir.1991).

 The elements of a claim based on larceny differ from those of a claim based on embezzlement only in that a larcenous debtor has come into possession wrongfully, 4 King, *Collier on Bankruptcy* (15th ed. rev.1997) ("*Collier*"), § 523.10[2].

 There is no wrongful taking or use here, nor circumstances indicating fraud. It is undisputed that Debtor holds a security interest in the property, and the express terms of that interest include a right to sell the property if his debt is not paid upon demand—he made demand for payment by August 25, 1998, and it was not met, so he had a right to sell the property at that point; instead, he only moved it into storage at his own expense. Debtor testified without contradiction that he was prepared to return the property upon promise of future (not present) payment in a negotiated amount, and also to permit inspection (which was never requested). With respect to funds on deposit, Debtor showed that he applied those to corporate purposes. Creditor has established neither embezzlement nor larceny.

*(4) § 523(a)(6)*

██ A debt arising from willful, malicious damage to the property of another is excepted from discharge pursuant to § 523(a)(6). The elements of a claim under this statute have been established by *In re Jercich*, 238 F.3d 1202, 1208–09 (9th Cir.2001) (*"Jercich"*):

> We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under [*Kawaauhau, et vir. v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998)], the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct.... A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. [internal quotation marks and citation omitted]

In the recent case of *In re Su*, 290 F.3d 1140 (9th Cir.2002) (*"Su"*), the Ninth Circuit noted (at 1148) that willfulness and malice are two separate requirements that are not to be "conflated" into a single inquiry, and made it clear that each alternative prong of the willfulness showing must be based on a subjective standard:

> The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain.

*Su* at 1146.

The evidence does not show that Debtor had any subjective intent to harm the corporation within the meaning of *Jercich* and *Su*. He testified that his decision to resign was a difficult one but he felt that the business was harming his friendship with Loomis, and he gave two weeks' notice before he left—the property that he took was his collateral and he had a right to sell it when his debt was not paid, but instead maintained it in storage at his own expense—he said that he was prepared to return the property if the corporation would agree to pay a negotiated portion of his debt in the future—he testified credibly that he did not use the corporation's property in his new business. The facts of this case do not support a conclusion of willful and malicious damage under § 523(a)(6).

## B. Debtor's Counterclaim

Debtor's counterclaim seeks judgment against the corporation for payment of the amounts represented by Note A and Note C, as explained by the February 24, 1997 letter from Anne Mitchell, CPA: principal balances of $28,838 plus $37,427 totalling $66,956.64, plus interest of $30,961.64 to the date of demand on August 25, 1988, plus interest at the rate of $18.01 per day from the date of demand to the date of judgment.

Creditor does not contend that Debtor is not owed some amount of money for deferred compensation plus the value of the sole proprietorship's assets that he contributed when the corporation was formed, and Creditor did not overcome the evidence of the notes, *e.g.* by demonstrating that the amounts set forth in them are not the correct amounts owed for those debts. Rather, Creditor appears to rely on Loomis' testimony that Note A was paid, and Note C was not signed and was not "approved" by the corporation because there was no agreement to pay interest and the principal included an amount that had already been paid on Note A. Loomis' testimony is refuted by the minutes of the December 18, 1996 meeting, which he acknowledged were prepared by him. As set forth above, those minutes state that "[i]t was unanimously agreed and a Reso-

lution passed" to pay Debtor for his initial investment plus deferred compensation for 1993 through 1995 "plus appropriate interest"—a "Secretary's Post–Meeting Addendum" to those minutes on February 25, 1997 states that an accounting of the notes was "submitted for issuance of Promissory Notes and finalization of the Resolution" with an amount of $66,265 that "appears to be correct". Loomis' testimony that the notes were not "approved" by the corporation is inconsistent with the minutes' statement that a Resolution was "unanimously" passed on December 18, 1996 to pay Debtor for his investment plus deferred compensation with interest—the testimony is also inconsistent with the minutes' addendum stating that the accounting for the notes' total of $66,265 "appears to be correct". Regardless of whether "finalization of the Resolution" ever occurred, and regardless of whether Note C was signed by Loomis, the December 18, 1996 minutes clearly show that the corporation agreed to pay Debtor for his initial investment plus deferred compensation, with interest—as for the amount to be paid, the February 25, 1997 addendum shows that the principal sum of $66,265 at least "appear[ed]" correct to Loomis on that date, and there is no evidence that the corporation later had reason to consider that amount to be incorrect, or that the corporation disagreed with the amount. With respect to the interest rate and attorneys' fee clause of the notes, Note A and Note C both provide for the prevailing party in an action to enforce or collect the note to recover reasonable attorneys' fees. All terms and provisions of Note A and Note C are identical to those of corporate notes given to Wolfe and Cryz, including the interest rate and the provision for recovery of attorneys' fees—Loomis acknowledges having signed Note A.

Debtor has established that he is entitled to judgment against the corporation for the principal balances represented by Note A and Note C totalling $66,265, plus interest at the rate of 10% totalling $30,691.64 to the August 25, 1998 date of demand, plus interest at the rate of $18.01 per day thereafter to the date of judgment. Debtor is also entitled to recover reasonable attorneys' fees incurred to enforce and collect the notes.

### CONCLUSION

For the reasons set forth above, Creditor has not established an exception to discharge under § 523(a)(2)(A), or (4), or (6), and is therefore not entitled to judgment in its favor on its complaint to determine dischargeability. The complaint is moot to the extent that it seeks judgment for a debt, since any debt would be unenforceable against Debtor due to his bankruptcy discharge, and the bankruptcy estate has been closed without assets.

For the reasons set forth above, Debtor is entitled to judgment in his favor on his counterclaim for money.

Counsel for Debtor shall submit a form of judgment so providing, after review as to form by counsel for Creditor.