**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>VICTOR HUEZO,<br><div style="text-align:right">Debtor.</div> | BAP No. CC-19-1260-LTaF<br><br>Bk. No. 2:11-bk-35922-RK |
| VICTOR HUEZO,<br><div style="text-align:right">Appellant,</div><br>v.<br>JOEY BALL,<br><div style="text-align:right">Appellee.</div> | Adv. No. 2:11-ap-02825-RK<br><br>**MEMORANDUM**[*] |

Appeal from the United States Bankruptcy Court
for the Central District of California
Honorable Robert N. Kwan, Bankruptcy Judge, Presiding

Before: LAFFERTY, TAYLOR, and FARIS, Bankruptcy Judges.

## INTRODUCTION

Chapter 7[1] debtor Victor Huezo appeals the bankruptcy court's

judgment of nondischargeability for $874,620.24 in favor of Appellee Joey

---

[*]This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

Ball. Mr. Ball made several "investments" in Mr. Huezo's business, Fremont Investment Holdings, Inc. ("Fremont"), based on Mr. Huezo's oral and written representations that those investments would be used to fund specific hard money secured loans.[2] Some of the investments were instead used to fund higher risk unsecured loans or to pay Mr. Huezo commissions, and some of the funds were recycled into new loans without authorization from Mr. Ball. Although Mr. Ball received some payments, Fremont ultimately defaulted and filed bankruptcy, as did Mr. Huezo.

After a trial (and significant post-trial activity), the bankruptcy court found the debt to Mr. Ball nondischargeable under §§ 523(a)(2)(A) and (a)(6). Mr. Ball challenges the bankruptcy court's findings regarding justifiable reliance and willful and malicious conduct. He also contests the bankruptcy court's allocation of payments and credits and its prejudgment interest calculation.

He has not shown that the bankruptcy court erred in its findings on the merits of the nondischargeability claims. But in calculating the final judgment amount, the bankruptcy court did not apply a $29,000 payment that Mr. Ball received after the trial on the nondischargeability claims but before entry of the final judgment. The final judgment amount is therefore

---

[2]Although the parties and the court referred to Mr. Ball's contributions to Fremont alternatively as "investments" and "loans," the record shows that the transactions were intended as loans.

incorrect.

Accordingly, we AFFIRM in part, VACATE in part, and REMAND.

## FACTUAL BACKGROUND

**Pre-Petition Events**

In 2006 and 2007, Mr. Ball became acquainted with Mr. Huezo through several golf outings with their mutual friend, Curtis Hayden. Mr. Ball, a businessman, had owned and operated tanning salons for over a decade. He had been acquainted with the Huezo family for nearly 25 years, having gone to high school with Mr. Huezo's older brother, but he did not get to know Mr. Huezo until these golf outings. Mr. Hayden was Mr. Ball's longtime friend and a real estate agent who had handled a transaction for Mr. Ball. Mr. Hayden knew that Mr. Ball was holding significant liquid assets. He also knew that Mr. Huezo was seeking investors for Fremont, which was in the business of lending money using funds from third-party investors. Mr. Hayden suggested that Mr. Ball approach Mr. Huezo about investing in Fremont.

Mr. Huezo held real estate sales and broker's licenses and had been involved in commercial lending since the late 1990s. In 2007, Mr. Huezo was the majority owner of Fremont; he later bought out the minority owner and became Fremont's sole owner. During the relevant time periods, he used the title "Executive Vice President-CEO," and he was the sole individual who handled all accounting functions for Fremont. Through his

3

efforts, Fremont obtained a California Department of Corporations Finance Lender's License.

In late 2006 and early 2007, Mr. Ball went out on five or six golf outings with Mr. Hayden and Mr. Huezo. Mr. Huezo told Mr. Ball that Fremont was a real estate broker and lender and was very profitable. He told Mr. Ball that: (1) Fremont had been making a lot of money on loans; (2) Fremont was getting a lender's license that would allow it to guarantee loans; (3) Fremont had other investors; and (4) the other investors would buy out Mr. Ball's investment within 30 days if Mr. Ball wanted his money back. He also told Mr. Ball that the loans were highly collateralized secured loans that had little to no risk and were guaranteed, and that Mr. Ball would be paid a 15 percent return on his investment.[3] In reality, Fremont's primary source of capital for its lending business was Mr. Ball.

In July 2007, Mr. Huezo sent Mr. Ball written materials explaining Fremont's lending program (the "Fremont Informational Materials"), which stated that Fremont investors were guaranteed to receive monthly payments at rates of 8.5 percent to 15 percent annually. The Fremont Informational Materials stated that investors would have their money secured by the assets and collateral held by Fremont from loans it made to

---

[3]The trial testimony on these points was disputed by Mr. Huezo and Mr. Hayden, but the bankruptcy court found their testimony not credible and Mr. Ball's testimony credible.

borrowers and that before Fremont processed any loans, investors would receive an "activity report" describing the type and amount of loans, proposed interest rate, total debt owed and collateral value for the proposed loans. Additionally, the materials stated that most investors would be paid within 12 months or when the loans made came due but that Fremont would pay the money back sooner if the investor needed it. The materials also stated that Fremont would send all investors quarterly balance sheets. No balance sheets were provided to Mr. Ball during the relevant time periods.

Mr. Ball made four loans to Fremont: (1) $240,000 in November 2007; (2) $70,000 in January 2008; (3) $130,000 in February 2008; and (4) $404,750 in March 2008. Only the first, second, and fourth loans are at issue in this appeal.[4]

**First Loan: November 2007 - $240,000**

On November 26, 2007, Mr. Huezo sent Mr. Ball an Investor Activity Report (the "November Report") listing four proposed "Secured Loans" to be made by Fremont that implicitly would be funded by Mr. Ball's investment of $240,000. Each loan listed an interest rate of 15 percent. The total amount to be loaned was listed as $240,000, to be secured by collateral worth $1,580,000. The November Report included a standard paragraph

---

[4]The bankruptcy court found dischargeable the $130,000 loan made in February 2008; Mr. Ball did not cross-appeal that decision.

stating:

> Here is a list of the proposed loans we are going to close this week. In order, [sic] to issue credit to our clients we will need to know your commitment to Fremont Investment Holdings, Inc. Please take a few moments to fax back your commitment. Priority on to [sic] the loan commitments will be based on a first come, first serve [sic] basis.

The November Report contained blank spaces for Mr. Ball to fill in the amount he was willing to commit and the date the funds would be available. At the bottom of the page was language certifying that the investor would commit to making the funds available within three days of faxing in the commitment, and a signature line. Mr. Huezo orally confirmed to Mr. Ball that the $240,000 investment was intended for the listed loans, which would be collateralized by real property worth more than enough to secure the loans. Mr. Ball filled out and signed the report and wired $240,000 to Fremont on November 28, 2007. Mr. Huezo then gave Mr. Ball a promissory note dated November 28, 2007 for $240,000, which listed Fremont as the borrower and was signed by Mr. Huezo as Executive Vice President-CEO. The note provided for a 15 percent interest rate, monthly payments of $3,000, and a maturity date of January 1, 2009. Paragraph 7 of the note indicated it was a "Uniform Secured Note."

It is not clear whether Mr. Ball's investment was used for all of the loans listed on the November Report or only one, a loan to Inocencio Rodriguez. Although that loan was secured by a deed of trust, the amount

loaned by Fremont was $250,000 rather than the $150,000 listed on the November Report, which substantially changed the loan to value ratio, given the collateral value of $340,000. When the Rodriguez loan was repaid, the money was not used to pay back Mr. Ball. Instead, Fremont used the funds for a second $250,000 loan to Mr. Rodriguez without obtaining Mr. Ball's authorization. The second Rodriguez loan was paid in full in May 2008, but Mr. Ball was not repaid. Mr. Huezo paid himself a $30,000 commission from the funds, again without authorization from Mr. Ball, but Mr. Huezo did not explain what happened to the balance, other than a nominal amount Fremont paid Mr. Ball.

**Second Loan: January 2008 - $70,000**

In January 2008, Mr. Huezo solicited another investment of $70,000, emailing Mr. Ball an Investor Activity Report (the "January Report") listing two proposed loans totaling $70,000 at 15 percent interest and secured by collateral worth a total of $790,000. The January Report contained the same standard language as the November Report and, again, Mr. Huezo orally represented to Mr. Ball that the $70,000 investment was intended to fund the listed loans. Mr. Ball completed the paperwork and wired the funds to Fremont, after which Mr. Huezo delivered to Mr. Ball a promissory note dated January 11, 2008 for $70,000, which listed Fremont as the borrower and was signed by Mr. Huezo as Executive Vice President-CEO. The note provided for a 15 percent interest rate, monthly payments of $875, and a

7

maturity date of February 1, 2009. Again, Paragraph 7 of the note indicated it was a "Uniform Secured Note."

Fremont thereafter made two loans of $46,000 and $40,000, respectively, although the second loan was not made from Mr. Ball's January investment.[5] Instead, the funds remaining after the $46,000 loan were used for operational and other purposes, including a $30,000 disbursement from Fremont's bank account to Mr. Huezo's personal bank account. In any event, neither loan was secured, and neither loan was repaid.

**Fourth Loan: March 2008 - Las Vegas and Los Angeles Deals $404,750**

In February and March 2008, Mr. Huezo solicited another investment from Mr. Ball, this time to fund two deals, a "Vegas deal" and a "Los Angeles deal," both of which were to be secured loans. Mr. Ball agreed to invest $404,750. Although no Investor Activity Report was provided for these loans, Mr. Ball relied on Mr. Huezo's oral representations that the $404,750 was to fund two secured loans, the larger of which ($367,250) would be secured by real property in Las Vegas with equity well in excess of the loan amount. For reasons that are unclear, multiple promissory notes were executed in connection with the transaction. Two notes dated March

---

[5]The $40,000 loan was made in May 2008, and the bankruptcy court found not credible Mr. Huezo's testimony that the funds for that loan came from the January investment because in the intervening time, Mr. Ball had made additional investments with Fremont in excess of $500,000.

21, 2008, each for $404,750, were executed, with monthly payments to commence March 1, 2008. Fremont was designated as the obligor on one of the notes and "Victor Huezo of Fremont Investment Holdings, Inc. DBA Fremont Investment Funding" on the other. Another promissory note for $460,000 dated March 21, 2008, was executed by Mr. Huezo on behalf of Fremont. On December 31, 2008, an assignment of that promissory note was executed by Mr. Huezo assigning to Mr. Ball the beneficial interest in that note.

The Las Vegas deal fell through and was never funded, but Mr. Huezo sent Mr. Ball an email on March 25, 2008, telling him that the deal was still on and to wire the funds. Mr. Ball did so the next day. It is not clear whether Mr. Ball's investment was used to fund the Los Angeles deal, but in July and September 2008, Fremont disbursed approximately $92,000 to the borrower for that deal and obtained a promissory note for $100,000, but no security interest was granted to secure that note.

**Payments from Fremont**

Between January 2008 and July 2010, Fremont made several payments to Mr. Ball totaling $282,624.27. In 2013, Mr. Ball received a distribution from the Fremont bankruptcy estate of $102,855.96.[6]

**Bankruptcy Case and Adversary Proceeding**

---

[6]As will be discussed below, Mr. Ball received an additional distribution of $29,068.42 from the Fremont bankruptcy estate in September 2016.

Mr. Huezo filed a chapter 7 petition on June 15, 2011. Mr. Ball filed a timely complaint seeking a declaration of nondischargeability of the debt owed to him under §§ 523(a)(2)(A) and (a)(6).[7] After a four-day trial in April 2014, the bankruptcy court took the matter under submission. For unknown reasons, the court did not issue a decision until over two years later, in September 2016.[8] The bankruptcy court's memorandum decision found the portion of the debt attributable to the November 2007 and January 2008 loans nondischargeable under § 523(a)(2)(A) only ("September 2016 Memorandum"). The September 2016 Memorandum did not include a calculation of the amount of prejudgment interest to be awarded; it ordered Mr. Ball to submit a proposed final judgment and a declaration in support of his computations of prejudgment interest. Before he did so, Mr. Huezo filed a notice of appeal.[9]

After reviewing the proposed judgment and notice of appeal, the bankruptcy court entered an order in November 2016 vacating the September 2016 Memorandum due to the court's errors in calculating

---

[7]In his answer to the complaint, Mr. Huezo asserted that he was not liable for the debt (presumably because the notes at issue were executed by Fremont). It is not clear whether the bankruptcy court ever explicitly ruled on that issue, but Mr. Huezo has not raised the issue in this appeal.

[8]There are no entries on the adversary proceeding docket between August 22, 2014 and May 17, 2016, when the court requested further briefing on the issue of allocation of payments.

[9]That appeal (No. CC-16-1344) was dismissed as moot on January 6, 2017.

prejudgment interest and in failing to consider certain documents included in requests for judicial notice submitted before trial. After further briefing and status conferences and consideration of additional evidence, including the declaration of Mr. Ball's counsel setting forth his interest computation, the bankruptcy court issued an amended memorandum decision on September 30, 2019 finding nondischargeable the debt attributable to the November 2007, January 2008, and March 2008 loans.[10] After credits, the bankruptcy court found the total amount of the nondischargeable debt to be $478,598.67 plus prejudgment interest of 7 percent under California Civil Code § 3287(a). The court entered a final judgment on October 29, 2019 for $874,620.24, including prejudgment interest.[11]

Mr. Huezo timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

---

[10]Contrary to appellant's counsel's assertion at oral argument, the bankruptcy court changed its ruling with respect to the March 2008 loans based on its examination of the additional evidence, not on any reassessment of witness credibility.

[11]The bankruptcy court did not award the interest rate provided by the promissory notes because it found that rate (15 percent) to be usurious. It did not, however, disallow all interest because it found that Mr. Huezo was estopped by his fraudulent conduct.

## ISSUES

Whether the bankruptcy court had jurisdiction to vacate the September 2016 Memorandum.

Whether the bankruptcy court erred in finding the debt resulting from the November 2007, January 2008, and March 2008 investments nondischargeable under § 523(a)(2)(A).

Whether the bankruptcy court erred in finding the debt resulting from the November 2007, January 2008, and March 2008 investments nondischargeable under § 523(a)(6).

Whether the bankruptcy court erred in its allocation of payments and credits.

Whether the bankruptcy court erred in its computation of prejudgment interest.

## STANDARDS OF REVIEW

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). Whether a creditor justifiably relied on a debtor's false representations is a question of fact reviewed for clear error. *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1456 (9th Cir. 1992). We also review for clear error findings that an injury is willful, *see Gee v. Hammond (In re Gee)*, 173 B.R. 189, 192 (9th Cir. BAP 1994), and malicious, *see Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 427 (9th

Cir. BAP 2002).

A finding of fact is clearly erroneous if it is illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). When factual findings are based on credibility determinations, we must give even greater deference to the bankruptcy court's findings. *Id.* at 575.

## DISCUSSION

In this appeal, Mr. Huezo assigns error to the entry of judgment of nondischargeability under §§ 523(a)(2)(A) and (a)(6). With respect to the § 523(a)(2)(A) claim, he argues that the bankruptcy court erred in finding that Mr. Ball justifiably relied on Mr. Huezo's representations in making investment loans to Fremont. As to the § 523(a)(6) claim, he argues that the bankruptcy court erred in finding that he acted willfully and maliciously in convincing Mr. Ball to make the loans.

Additionally, Mr. Huezo contends that the bankruptcy court erred in: (1) allocating the payments and credits to be applied to the loans; and (2) computing the amount of prejudgment interest awarded.

Finally, Mr. Huezo contends that the bankruptcy court had no jurisdiction to vacate the September 2016 Memorandum because, at the time it did so, an appeal was pending before the Bankruptcy Appellate

13

Panel. Because this argument challenges the bankruptcy court's jurisdiction, we address it first.

## A. The bankruptcy court retained jurisdiction to vacate the September 2016 Memorandum.

Mr. Huezo correctly points out that "[t]he timely filing of a notice of appeal to either a district court or bankruptcy appellate panel will typically divest a bankruptcy court of jurisdiction 'over those aspects of the case involved in the appeal.'" *Sherman v. Sec. & Exch. Comm'n (In re Sherman)*, 491 F.3d 948, 967 (9th Cir. 2007) (quoting *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184, 1190 (9th Cir. 2000)). *See also Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). But this rule assumes that the notice of appeal relates to an entered final order or judgment, which is not the case here.

As noted, Mr. Huezo filed a premature notice of appeal after the bankruptcy court entered the September 2016 Memorandum but before it entered a final judgment. Rule 8002(a)(2) provides, "[a] notice of appeal filed after the bankruptcy court announces a decision or order–but before entry of the judgment, order, or decree–is treated as filed on the date of and after the entry." Because no judgment based on the September 2016

14

Memorandum was entered, the notice of appeal did not become effective, and jurisdiction was never transferred to the Bankruptcy Appellate Panel.

Additionally, jurisdiction did not transfer to the Panel because the September 2016 Memorandum was not a final order. This Panel lacks jurisdiction over interlocutory orders unless it grants leave to appeal. *See* 28 U.S.C. § 158(a)(3); *Rains v. Flinn (In re Rains)*, 428 F.3d 893, 904 (9th Cir. 2005) (appeal from an interlocutory order is premature and does not transfer jurisdiction to the appellate court absent leave of that court).

For these reasons, we hold that the bankruptcy court retained jurisdiction to vacate the September 2016 Memorandum.

## B. The bankruptcy court did not clearly err in finding that Mr. Ball justifiably relied on Mr. Huezo's misrepresentations.

In this circuit, a creditor asserting nondischargeability of a debt under § 523(a)(2)(A) must establish five elements:

> (1) misrepresentation, fraudulent omission or deceptI've conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000). A fraudulent omission in the face of a duty to disclose may constitute a false representation. *Harmon v. Kobrin (In re*

15

*Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001). In cases where a plaintiff establishes the nondisclosure of a material fact that the debtor was under a duty to disclose, the reliance and causation elements are established and need not be separately proven. *Apte v. Romesh Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1323 (9th Cir. 1996).

Mr. Huezo challenges only one of the bankruptcy court's findings on these elements: that Mr. Ball justifiably relied on Mr. Huezo's statements. In determining justifiable reliance, the bankruptcy "court must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor." *In re Kirsh*, 973 F.2d at 1460.

> The general rule is that a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation. In other words, negligence in failing to discover an intentional misrepresentation is no defense. However, a person cannot rely on a representation if he knows that it is false or its falsity is obvious to him. In sum, although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth.

*Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir. BAP 1995), *aff'd*, 96 F.3d 1319 (9th Cir. 1996) (citations and quotation marks omitted).

Mr. Huezo contends that there were several "red flags" that should

16

have triggered Mr. Ball to investigate further, specifically: (1) the "very high" interest rate (15 percent) to be paid on short term, secured loans; (2) Mr. Ball committed to the investments without receiving any information on the creditworthiness of the borrowers, despite language in the reports stating that he had approved borrower credit; (3) Mr. Ball never received any security or guaranty documents on any of the loans, nor did he receive a note for the March 2008 loan until 2010; (4) Mr. Ball never received any balance sheets for Fremont, despite requesting them; (5) the promissory notes appeared to be taken off the internet, and each included a paragraph stating that the note was a "Uniform Secured Note" and a "Security Instrument" and referred to a nonexistent "Section 15"; and (5) the second check to Mr. Ball for $3,875 was a handwritten, temporary check apparently drawn on a brand new bank account.

The bankruptcy court found that although Mr. Ball was an experienced small businessman, he was not a sophisticated investor. The bankruptcy court also found that, with respect to all of the subject loans, Mr. Ball's reliance on Mr. Huezo's representations was justifiable, in part based on the long history of friendship with Mr. Huezo's family and the fact that Mr. Ball thought of Mr. Huezo as a "friend." Regarding the November 2007 and January 2008 loans, the bankruptcy court also cited its findings that Mr. Huezo's oral representations were consistent with the relevant Investor Activity Reports and the fact that Mr. Ball received

17

promissory notes for those loans. As for the March 2008 loan, the bankruptcy court cited its finding that Mr. Huezo's oral representations were consistent with email messages regarding the Las Vegas and Los Angeles deals, i.e., that the loans would have "tons of collateral," and because, by then, Fremont had started making regular payments on the earlier loans.

Given that "a person may justifiably rely on a representation even if the falsity of the representation could have been ascertained upon investigation," *id.* at 229, Mr. Huezo's arguments are not well taken. Although there were some aspects of the transactions that were out of the ordinary, they cannot be characterized as "preposterous" or obvious enough to require investigation in light of the relationship between Mr. Ball and Mr. Huezo. The bankruptcy court's finding that Mr. Ball justifiably relied on Mr. Huezo's intentional misrepresentations was not illogical, implausible, or without support in the record. Additionally, the court's underlying findings were largely based on credibility determinations, to which we must defer. Mr. Huezo has not established that the bankruptcy court clearly erred in finding that the justifiable reliance element was met.[12]

---

[12]In his arguments regarding justifiable reliance, Mr. Huezo incorrectly relies in part on cases involving the objective "reasonable reliance" standard applicable to claims under § 523(a)(2)(B): *Heritage Pacific Financial, LLC v. Machuca (In re Machuca)*, 483 B.R.

(continued...)

**C.    The bankruptcy court did not err in finding the debt nondischargeable under § 523(a)(6).**

To prevail on a § 523(a)(6) claim, the plaintiff must establish that the debt at issue is "for willful and malicious injury by the debtor to another entity or to the property of another entity." The willful and malicious prongs of the claim must both be established. *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2008).

A "willful" injury is a "deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)). "[T]he willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury or that the debtor believed that injury was substantially certain to occur as a result of his conduct." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001).

A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse. *Id.*

The bankruptcy court found that these elements were met. The court found Mr. Huezo's conduct "willful" based upon its findings that (1) Mr. Huezo knew that Mr. Ball was relying on the Investor Activity

---

[12](...continued)
726 (9th Cir. BAP 2012); and *Heritage Pacific Financial, LLC v. Montano (In re Montano)*, 501 B.R. 96 (9th Cir. BAP 2013).

19

Reports (with respect to the November 2007 and January 2008 loans) and his oral and written representations (with respect to the March 2008 loan) and intended his investments to be used for secured loans to specific borrowers; (2) despite this knowledge, Mr. Huezo diverted the funds Fremont received from the payoff of the loans to pay himself commissions and recycle the remaining money into new loans, including unsecured loans, without Mr. Ball's consent; and (3) Mr. Huezo, as a real estate professional with extensive experience with commercial lending, would have known that a secured loan would be less likely to injure Mr. Ball than an unsecured loan, and that is why Mr. Ball conditioned his investments on Fremont making secured loans. The bankruptcy court held that this conduct rose to the level of a subjective motive to inflict injury or proof that Mr. Huezo knew that injury was substantially certain to result.

The bankruptcy court found that the injury to Mr. Ball was malicious because

> it involved a wrongful act by Huezo in making false representations to Ball, which was done intentionally as previously discussed, which necessarily caused injury because Huezo either took the money for himself or recycled Ball's money into new, [riskier] unsecured loans, contrary to his representations to Ball that the loans would be secured and to specifically identified borrowers and without just cause or excuse since Huezo took the money for himself and recycled Ball's money into new loans without Ball's knowledge or consent.

Mr. Huezo argues that the bankruptcy court erred in finding that he acted willfully and maliciously. He contends that Mr. Huezo's conduct was a breach of contract only and not tortious because there was no evidence that Mr. Huezo intentionally failed to pay Mr. Ball, or that he failed to pay for the purpose of injuring Mr. Ball. Mr. Huezo argues that the fact that Fremont made several payments on the debt negates any inference that Mr. Huezo had a subjective motive to injure Mr. Ball. But he cites no authority for this proposition, and he fails to acknowledge that, under § 523(a)(6), tortious conduct may also be established by showing that the debtor believed that injury was substantially certain to occur as a result of his conduct.[13] He also seems to miss the point that the tortious conduct here is not solely in failing to pay Mr. Ball in full, but in diverting the funds he invested for purposes other than those promised, thus increasing Mr. Ball's risk of loss without his knowledge or consent.

**D. We must remand for the bankruptcy court to recalculate the judgment amount.**

**1. Payment and Credit Allocation**

Of the $282,624.27 in payments made to Mr. Ball, the bankruptcy court allocated $212,634.87 to the November 2007, January 2008, and March

---

[13]Mr. Huezo does not seem fully to grasp this aspect of the standard. He argues "[t]here was no testimony by Ball which even referenced his belief that Huezo had a subjective motive. And a belief by Ball that not paying him on the Fremont promissory notes was 'substantially certain' to cause injury happens every time a debt is not repaid." But it is Mr. Huezo's subjective belief, not Mr. Ball's, that is relevant.

2008 loans, and the remaining $69,989.40 to the (dischargeable) February 2008 loan. The court also applied a "construction and insurance credit" of $31,355.29 ratably to all four loans ($7,838.82 per loan). It allocated the entire $102,855.96 Mr. Ball received from the Fremont bankruptcy estate to the dischargeable portion of the debt, the February loan of $130,000. In addition, the bankruptcy court also applied to the February loan $69,989.40 in payments made by Fremont. These credits resulted in a $50,684.18 overpayment of the February loan, and an overpayment of $7,953.22 of the January loan. The court held that these surplus amounts were to be applied to prejudgment interest on the respective (January and February) notes.

Mr. Huezo does not contest the allocation of payments to the nondischargeable debt, but he argues that the $50,684.18 surplus on the February loan should have been applied to the principal of the November 2007 loan, "which would have reduced the prejudgment interest significantly." But he cites no factual or legal basis for this assertion, and we see no error in the bankruptcy court's allocation of the overpayments to prejudgment interest on the associated loans.

More concerning is that Mr. Ball received an additional distribution of $29,068.42 from the Fremont bankruptcy estate in September 2016. It does not appear that anyone pointed this out to the bankruptcy court before it made its calculation, but the application of this payment impacts the total amount of the judgment. Accordingly, we must remand for the

22

bankruptcy court to recalculate the judgment amount.

## 2. Interest Computation

The bankruptcy court's amended memorandum decision left the amount of prejudgment interest under California Civil Code § 3287 to be determined after submission of a declaration in support of Mr. Ball's computations of prejudgment interest. On October 17, 2019, Mr. Ball's counsel submitted a proposed judgment and declaration that set forth the calculation; the bankruptcy court adopted Mr. Ball's figures in the final judgment entered October 29, 2019.[14] The calculation began with the court's determination of the final amount of the nondischargeable debt, $478,598.67, and added prejudgment interest from the respective maturity dates of the notes, $396,021.57, for a final judgment amount of $874,620.24 as of September 30, 2019.

Mr. Huezo argues that the bankruptcy court erred in computing the amount of prejudgment interest. This argument is, in part, an extension of his argument regarding the payment allocation. He contends that the calculation started with the wrong amount, $478,598.67, which did not reflect the $50,684.18 overpayment that he thinks should have been applied to the November 2007 loan. We have disposed of this issue.

Mr. Huezo also argues that the court's interest calculation is a "total

---

[14]The proposed judgment and declaration were served on Mr. Huezo's counsel, and no objection was filed.

23

mystery," but his confusion seems to stem from the fact that he refers to figures set forth in a brief filed by Mr. Ball in August 2017, not the declaration filed in October 2019. That declaration sets forth the interest calculation in great detail, and, other than the omission of the $29,068.42 distribution discussed above, we have no basis on which to find that the bankruptcy court erred in adopting it.

At the same time, as discussed above, the final judgment amount, including prejudgment interest, will need to be recalculated on remand to take into account the omitted payment.

## CONCLUSION

Mr. Huezo has not shown that the bankruptcy court erred in any of its findings underlying the merits of the nondischargeability claims. We therefore AFFIRM the judgment to the extent it declares the debt nondischargeable. But for the reasons explained above, we VACATE and REMAND for the bankruptcy court to recalculate the correct amount of the judgment.